Richard L. McFARLAND

v.

**UNITED STATES of America.**

Civ. No. 18054.

United States District Court
D. Maryland.

June 7, 1968.

---

William J. Evans, court-appointed, Baltimore, Md., for petitioner.

Stephen H. Sachs, U. S. Atty., and Donald E. Sharpe, Asst. U. S. Atty., Baltimore, Md., for respondent.

THOMSEN, Chief Judge.

In this petition under 28 U.S.C. § 2255 McFarland attacks four convictions and sentences imposed in 1964 after he had entered pleas of guilty to four separate indictments charging bank robberies in Silver Spring, Maryland, Balti-more, Maryland, San Diego, California, and Las Vegas, Nevada, respectively.

On January 29, 1964, McFarland, Sullivan and Fritts robbed the West Baltimore office of the Maryland National Bank. As they were leaving the bank, Fritts shot and killed a policeman.

McFarland went west as far as San Francisco. On February 9, he left San Francisco, and arrived at Las Vegas on February 10 about 7:00 p. m. He gambled and drank during the evening, and about midnight registered at the Desert Inn, went to his room and slept. Around 9:15 a. m. on February 11, he came to the lobby of the Desert Inn and made a telephone call to his wife, who told him that the F.B.I. was looking for him. As he left the phone booth about 9:25 a. m., he was arrested by F.B.I. agents, who identified themselves, told him that he was under arrest for robbing a bank in Maryland, and told him that he did not have to say anything if he did not want to. They asked his name and Mc-Farland told them that his name was Larry Farrell, which the agents knew to be an alias used by McFarland. The agents took him outside, searched him for weapons and took his wallet, which contained various cards, one or two in the name of Farrell but most in the name of McFarland. He was placed in a car with two agents, one of whom drove, and taken to the F.B.I. office, some five miles away, arriving about 9:45 a. m. Immediately after they entered the car, one of the agents advised McFarland more fully of his rights, specifically that he need not say anything, that anything he said might be used against him in court and that he had a right to consult a lawyer before he said anything. The agents then asked him if he was not in fact Mc-Farland. He replied that he was and volunteered the statement: "I am one of the three men you are looking for". At the F.B.I. office two agents took Mc-Farland into a conference room, while one agent reported to the agent-in-charge, started someone looking for the United States Commissioner and sent

for the fingerprint expert and the photographer. That agent returned to the conference room and one of the other agents left.

McFarland was reminded of his rights, as previously told him. He did not ask for a lawyer. He did not ask to make a telephone call, but gave the agents an oral statement about the Baltimore robbery and his two accomplices, for whom the F.B.I. agents were still looking. Shortly after noon, the agents were told that the commissioner was either at the jail or on his way to the jail, some six blocks away from the F.B.I. office. They promptly took McFarland to the jail, entered and booked him, and took him before the commissioner. A short hearing was held. McFarland was advised of his rights, as appears not only from the testimony of the witnesses, but from the typed commissioner's report filed in the District Court the next day, and waived his right to counsel, indicating that he would engage counsel when he reached Baltimore. McFarland still had some money when arrested, and his family employed counsel to represent him when he reached Baltimore. Since the warrant from Maryland had not yet reached Nevada, McFarland was held in the Nevada jail. On February 13, McFarland was placed in a line-up in connection with a robbery of a Las Vegas savings and loan association, federally insured. He did not protest to the F.B.I. either before or after the line-up and he did not seriously protest, if at all, to the jailer. After the line-up he asked an F.B.I. agent if anyone had identified him. Since one witness had identified him positively and one tentatively, the agent answered "yes". McFarland was again advised of his rights, including his right to counsel, and he thereafter admitted the Las Vegas robbery. The F.B.I. agents then asked him if he had participated in other robberies and if he wanted to tell about any of them. McFarland then told the F.B.I. about his participation in a robbery of a federally insured savings and loan association in San Diego, California,

which the Nevada agents knew something about, and also volunteered that he had participated in the robbery of a savings and loan association at Four Corners, Silver Spring, Maryland, about which the Nevada agents knew nothing. McFarland said that he would like to have all of the cases, including the Baltimore case, disposed of in Nevada and asked if that could be done. The agents explained to him the provisions of Rule 20, F.R. Crim.P.

After McFarland was charged with the Nevada robbery, the commissioner appointed an attorney to represent him in that case, and McFarland had a conference with the attorney. By that time it was clear that the United States Attorney for the District of Maryland would not agree to a transfer of the Maryland case to Nevada, and McFarland told his attorney that he would wait until he got to Baltimore to employ a lawyer to represent him in the Maryland case. On February 18, McFarland appeared before the commissioner and signed a waiver of hearing on his transfer to Maryland. On February 20, the District Judge signed an order directing his transfer to Maryland.

He was brought to Maryland on March 15 or 16. Meanwhile, the indictment in this Court against Fritts, Sullivan and McFarland for the Maryland National Bank robbery had been returned on February 25, 1964. On March 30, 1964, an indictment against Fritts, Sullivan and McFarland for the murder of the policeman in connection with that robbery was filed in the Criminal Court of Baltimore. On April 21, McFarland and Sullivan were indicted in this District Court for the Silver Spring robbery, which had occurred on January 6, 1964.

Meanwhile, McFarland's family had retained Marshall A. Levin, Esq., a capable Baltimore lawyer experienced in criminal cases, who conferred with McFarland six or seven times at least. Counsel had been appointed for Fritts, and Sullivan's family had retained counsel for him. McFarland and Levin were aware that McFarland had been indicted on

April 10, 1964, in the District of Nevada for the robbery of the Las Vegas savings and loan association, and on April 15, in the Southern District of California for the robbery of the San Diego savings and loan association. The principal interests of McFarland and his counsel (Levin) were to avoid a possible death penalty in connection with the Maryland National Bank robbery indictment, to avoid conviction and a more probable death sentence in the murder case in the Criminal Court of Baltimore and, to that end, to prevent, if possible, a trial of the case in the Criminal Court. Other objectives were to obtain concurrent sentences in the Silver Spring case and in the cases then pending in the District of Nevada and the Southern District of California, in order to minimize parole problems. Levin wisely, and in the event correctly, advised McFarland that if he entered a plea of guilty in the Maryland National Bank case in this Court, and received a life sentence therein, he believed the State of Maryland would not insist on trying the murder case.[1] Counsel for the other two defendants reached the same conclusion and all defendants decided to enter pleas of guilty to all four counts of the Maryland National Bank indictment in this Court, including the count which carried the possible death penalty.

Sullivan and McFarland also decided to plead guilty to the three counts of the Silver Spring indictment, and McFarland decided to make arrangements to plead guilty later under Rule 20 to the California and Nevada indictments.

McFarland and Sullivan were arraigned first on the Silver Spring indictment. Each indicated, after appropriate questioning, that the pleas were voluntarily made, with full knowledge of the possible consequences. McFarland admitted that he participated in the Silver Spring robbery, stated that he was not armed in that robbery, but agreed that someone who participated in the robbery was armed. Both McFarland and Sullivan stated specifically that no promises of any sort had been made to them to induce their pleas.

Fritts, Sullivan and McFarland were then arraigned on the Maryland National Bank indictment and all three entered pleas of guilty to all four counts of that indictment, including the count alleging the killing of the policeman. When the pleas were entered, the writer of this opinion, who presided at the arraignment, followed the procedure approved in Seadlund v. United States, 97 F.2d 742, 748 (7 Cir. 1938). See also Robinson v. United States, 264 F.Supp. 146, 153 (W.D.Ky.1967). He not only made sure that the several defendants were entering the pleas voluntarily and with knowledge of the possible consequences, but advised the defendants of the following provision applicable to the fourth count:

"Whoever, in committing any offense defined in this section, or in avoiding or attempting to avoid apprehension for the commission of such offense, or in freeing himself or attempting to free himself from arrest or confinement from such offense, kills any person, or forces any person to accompany him without the consent of such person, shall be imprisoned not less than ten years, or punished by death if the verdict of the jury shall so direct."

The following proceedings then took place with respect to the defendant McFarland:

"THE COURT: You understand the nature of the various charges set out in the counts?

"THE DEFENDANT McFARLAND: Yes, sir.

"THE COURT: Particularly the nature of the charge set out in the fourth count?

"THE DEFENDANT McFARLAND: Yes, sir.

1. In fact the murder case in the Criminal Court of Baltimore was stetted on November 2, 1964.

"THE COURT: That in committing the offenses charged in the first, second and third counts, that is, the robbery of the Maryland National Bank, West Baltimore Office, on January 29, 1964, in committing the offense charged in the first, second and third counts Patrolman Claude J. Profili, Baltimore Police Department, was killed by one of you by shooting and wounding the said police officer while committing the offense aforesaid on the date aforesaid from which wound he died on February 6, 1964?

"THE DEFENDANT McFARLAND: Yes, I understand.

"THE COURT: And do you agree that you committed the offense charged in that count as well as in the others?

"THE DEFENDANT McFARLAND: Yes, sir.

"THE COURT: And you agree that you were there and that he was killed?

"THE DEFENDANT McFARLAND: Yes, sir.

"THE COURT: Now, have any promises been made to you to induce you to plead?

"THE DEFENDANT McFARLAND: No, sir, no promises, no kind of promises from anyone.

"THE COURT: Have any threats been made to you?

"THE DEFENDANT McFARLAND: No, sir.

"THE COURT: Are you pleading guilty of your own free will?

"THE DEFENDANT McFARLAND: Yes, sir.

"THE COURT: And do you understand that the Court may impose a prison sentence up to life or for any term of years?

"THE DEFENDANT McFARLAND: Yes, sir.

"THE COURT: And do you understand that the Court may impanel a jury to consider whether the death penalty may be imposed?

"THE DEFENDANT McFARLAND: Yes, sir.

"THE COURT: And you understand that a motion is going to be made in connection with that or arguments in connection with that by counsel? You understand that arguments are to be made on that point by your counsel as well as by the Government counsel and that you will have an opportunity to be heard on that point?

"THE DEFENDANT McFARLAND: Yes, sir.

"THE COURT: Before it is decided what should be done?

"THE DEFENDANT McFARLAND: Yes, sir.

"THE COURT: All right. Now, may I ask your counsel whether you are satisfied that he fully understands the nature of the charges against him and is able to cooperate with you in determining what should be done?

"MR. LEVIN: He does, sir. There is no question of his sanity.

"THE COURT: All right.

"And you understand, do you, that by making this plea, Mr. McFarland, that you are waiving any defense you may have?

"THE DEFENDANT McFARLAND: Yes, sir.

"THE COURT: And you are familiar, I suppose, with the motions that have been made by your counsel that were argued in Court—

"THE DEFENDANT McFARLAND: Yes, sir.

"THE COURT: —when you were here?

"THE DEFENDANT McFARLAND: Yes, sir.

"THE COURT: When the evidence was presented."

After brief further colloquy, the Court accepted the pleas and thereafter stated:

"THE COURT: Of course, the Court must consider whether the Court should impanel a jury to deter-

mine whether punishment by death should be imposed in this case. As I understand it, it has never been done in this district and that there is no case in this circuit on the question.

"Will you tell me first something about the facts of the case which bear on this point and whether the Government believes that the Court has the power to impanel such a jury and whether you feel that it should be done in this case.

"If you prefer to wait before you make your recommendation until after you have heard what the defense has to say you may delay your recommendation until the end."

The United States Attorney, Thomas J. Kenney, now a Judge of the Supreme Bench of Baltimore City, then said:

"MR. KENNEY: I would just as soon say what I have to say now, Your Honor.

"In the first place we agree with the Court that there is no precedent in this district, either in the district or in the circuit, so far as we know, where a jury has been impaneled in a case under this statute on guilty pleas.

"There are two cases that we have found, one in the Fifth Circuit and one in the Seventh Circuit where a District Court Judge has impaneled a jury to advise him, I take it, on the sentence when he was accepting a guilty plea under this section and under this particular paragraph.

"Our belief and opinion is that that is a valid procedure.

"It is also the opinion of my office and myself that absent a recommendation by a jury the Court is without power, the way this statute is worded, to impose the death penalty. In this particular case the Government is willing to have the Court dispose of this case and to impose sentence without impaneling a jury, and the circumstances that influence our thinking in the matter are these: These three defendants are without any substantial criminal record. Sullivan, I think, has one conviction, was drunk and disorderly on one occasion; and Fritts, a conviction for passing a bad check; McFarland has no prior record, conviction.

"I think they are not hardened thugs or criminals although some of them robbed more than one bank. But we do not think either that they had any expectation of killing when they went into the bank, and something developed when Officer Profili came in the door, on the spur of the moment and in the excitement and the contention that was present he was killed. Certainly it was something that could have been expected; they all three had guns. But we believe under those circumstances that justice could be done in this case without the imposition of the death penalty, and we are not unmindful of the fact too that there is an indictment pending across the street in the State Court on all three of these defendants of a homicide in connection with this same incident."

The following colloquy then ensued:

"THE COURT: Do the defendants wish to say anything?

"MR. LEVIN: Does Your Honor wish to hear from us with respect to this precise point or since its been made, obviously speaking for myself, and I am certain of co-counsel, I agree with Mr. Kenney's expressed intention to the Court, and I would want to be heard later on, sir, with respect to the defendant and his entire life?

"THE COURT: Oh, yes, of course, but do you have any questions or do you wish to say anything with respect to the power of the Court to impose the death penalty apart from impaneling a jury?

"MR. LEVIN: Our research has firmly established, sir, that if the jury is not impaneled that respectfully, sir, that you have no power whatsoever to impose the death penalty.

"THE COURT: Any of the counsel for any of the other defendants want to say anything?

"MR. KOUTZ: Your Honor, we have nothing to say. We would, of course, appreciate an opportunity at a later time to reveal to the Court the full background of our client.

"THE COURT: Yes, of course, but we haven't come to that yet.

"Is there going to be a statement to the Court as to which of the defendants actually did the shooting?

"MR. KOUTZ: Yes.

"MR. LEVIN: Yes.

"THE COURT: Is there any dispute among the defendants themselves as to who did the shooting?

"MR. MEAGHER: There is no dispute, Your Honor.

"THE COURT: All right. If there is no dispute, I take it one of the defendants admits, that he is going to admit he did the shooting; is that correct?

"THE CLERK: Is that correct, gentlemen?

"MR. RODOWSKY: Yes, Your Honor.

"MR. MEAGHER: That's correct.

"THE CLERK: They all nodded.

"THE COURT: Then, I will ask the Government whether the Government feels that the same considerations that the Government has indicated applies to all the defendants and whether the Government is making this recommendation with respect to all three defendants?

"MR. KENNEY: Yes, Your Honor. That doesn't mean that the Government is of the opinion that they all merit the same punishment. I reserve a statement on that, but what I have said heretofore applies to all three defendants including the one who actually did the shooting."

The Court then took a recess, after which the Court made the following statement:

"THE COURT: The indictment in this case charges three defendants with violation of the federal bank robbery statute, 18 United States Code 2113, and particularly of Subsection (e) thereof, which provides:

" 'Whoever in committing any offense defined in this section or in avoiding or attempting to avoid apprehension for the commission of such offense or in freeing himself or attempting to free himself from arrest or confinement for such offense, kills any person or forces any person to accompany him without the consent of such person shall be imprisoned not less than ten years or punished by death if the verdict of the jury shall so direct.'

"Each count of the indictment also refers to 18 United States Code 2, to the aiding and abetting section. The defendants have filed pleas of guilty to each count of the indictment.

"The Court has addressed each of the defendants personally and has determined that the pleas were made voluntarily with understanding of the nature of the charge and with the understanding that all possible defenses to the charge are being waived by offering the pleas.

"The Court has also satisfied itself that there is a factual basis for each of the pleas. Before accepting any such plea the Court should also consider whether such acceptance would prevent the imposition of a death sentence if the Court should conclude under all the circumstances that such a penalty should be imposed. It is extremely doubtful whether the Court has the power to sentence a defendant to death under Section 2113(e) on a plea of guilty unless the Court impanels a jury to hear testimony to determine by their verdict whether the death penalty should be imposed.

"Courts in other circuits have impaneled juries after pleas of guilty in similar cases, and in some cases

the juries have directed that the death penalty be imposed.

"No decision of the Supreme Court or of the Fourth Circuit has been cited or found. The Court concludes that it has the power to impanel a jury to decide whether the death penalty should be imposed. There is therefore no reason for refusing to accept the pleas, and the Court has accepted them.

"The question then arises whether a jury should be impaneled in this case. The Court has considered the facts presented by the United States Attorney and by counsel for the several defendants. On the one hand, armed robbery is a most serious crime, especially where someone is killed in the course of the robbery. On the other hand, the defendants are not professional criminals. None of the defendants has a record of prior criminal convictions, although McFarland and Sullivan have admitted today that they robbed at least one other bank or a savings and loan association at about the same time that they committed the robbery involved in this case.

"All three defendants admitted their guilt to the FBI when they were arrested, although none of them admitted that it was he who shot the policeman. I understand, however, that the defendants will agree among themselves as to who did the shooting, that the man who did the shooting intends to admit it. I have been so assured by all three of the counsel.

"Upon questioning by the Court the United States Attorney has stated that he does not recommend the impaneling of a jury nor the imposition of a death sentence by the Court.

"The Court has concluded that it should not impanel a jury but should hear and consider evidence and statements and arguments bearing upon the question of what penalty other than death should be imposed."

After a long hearing on the question of sentencing, in which the defendants were accorded the right of allocution, the Court imposed life sentences on all three defendants in the Maryland National Bank case, a 15 years concurrent sentence on McFarland in the Silver Spring case and a 10 years concurrent sentence on Sullivan in the Silver Spring case.

During the lunch interval in the sentencing hearing, after McFarland's case had been presented by his counsel but before McFarland had been accorded his right of allocution, McFarland, with the approval of his counsel, signed the necessary papers to have the Nevada and California indictments transferred to Maryland.

On July 23, 1964, nearly three weeks after the sentencing in the two Maryland cases, McFarland was again brought before the Court and entered guilty pleas to the one count indictment in each of those cases. After appropriate proceedings, he was sentenced to a term of 15 years in the Nevada case and to a term of 14 years in the California case, the sentences to run consecutively to each other and to the sentence imposed in the Silver Spring case, making a total of 44 years, all to run concurrently with the life sentence in the Maryland National Bank case. The Court understands that the effect of these sentences is to make the defendant McFarland eligible for parole in 15 years.

McFarland's carefully prepared motion under 28 U.S.C. § 2255 attacks all four convictions and sentences. With respect to the Maryland National Bank case, he contends that 18 U.S.C. § 2113(e) is unconstitutional, substantially for the reasons later stated by the Supreme Court in United States v. Jackson, 390 U.S. 570, 88 S.Ct. 1209, 20 L.Ed.2d 138, decided April 8, 1968. He asserted with respect to the other three judgments and sentences that they were obtained in violation of his rights to due process and equal protection because, as he alleges:

"(1) Petitioner was psychologically coerced and misled into pleading guilty to the remaining judgments and in accepting the sentences rendered upon

the information that his prior judgment, No. 26520 for which a life term had been imposed precluded any and all further punishment since a prisoner serving a life term is eligible for parole consideration and reentry into society after fifteen (15) years, *and petitioner not in fact being guilty consented to accept guilt and enter a plea of guilty to the said charges* on the representation that he would help 'clear the charges from the books' and, petitioner could thereby be assured of government's assistance and recommendation for parole consideration at the appropriate time. And further, that the pleas of guilty would in fact not be questioned by the court and would infer a cleansing of the soul which could only create a favorable impression with the Bureau of Prisons, Federal Bureau of Investigation, U. S. Board of Parole, and society in general." [2]

Counsel was appointed to represent McFarland on his 2255 motion, who communicated with McFarland before he was brought to Baltimore and had ample opportunity to confer with him in Baltimore before the 2255 hearing. McFarland testified at length and the government presented the testimony of the United States Marshal for the District of Nevada and of three special agents of the F.B.I., who had participated in the Las Vegas arrests or questioning or both.

(A) With respect to the judgment and sentence of life imprisonment in the Maryland National Bank case, the Court has carefully considered the opinions in United States v. Jackson, supra.[3] The circumstances of this case, however, are quite different from those presented to the Supreme Court in *Jackson*.

■ The opinion of the Court in *Jackson* did not discuss its applicability to guilty pleas or to trials without a jury before it was rendered. However, for the reasons stated in Linkletter v. Walker, 381 U.S. 618, 85 S.Ct. 1731, 14 L.Ed. 2d 601 (1965), Johnson v. State of New Jersey, 384 U.S. 719, 86 S.Ct. 1772, 16 L.Ed.2d 882 (1966), Davis v. State of North Carolina, 384 U.S. 737, 86 S.Ct. 1761, 16 L.Ed.2d 895 (1966), and Stovall v. Denno, 388 U.S. 293, 87 S.Ct. 1967, 18 L.Ed.2d 1199 (1967), the *Jackson* case should not be applied indiscriminately to strike out every judgment heretofore entered in a case where a defendant has entered a guilty plea; the totality of the circumstances in each case should be considered to determine whether there was any denial of due process in the light of the development of the law. When the totality of the circumstances in the instant case is considered, the Court finds that the pleas which were entered by McFarland in the Maryland National Bank case were entered for several reasons. The hope of minimizing the chances of a death sentence in the federal case was not the only reason for entering the pleas. Of at least equal importance was the belief of McFarland and his attorney Levin that if a life sentence could be obtained in the federal case, the prosecution and trial of the murder case in the Criminal Court of Baltimore, with a possible death sentence

---

**2.** The other ground alleged was:

"(2) Petitioner further asserts in support of the coercion and inducement above said that since petitioner's incarceration at Lewisburg Penitentiary petitioner has been visited *repeatedly* by agents of the Federal Bureau of Investigation in order for them to gain petitioner's further cooperation in entering more pleas of guilty, under Rule 20, to additional bank robbery charges for which there appears to be no prime suspect, and for which the Federal Bureau of Investigation wishes to close their books upon. Again, in return for said plea(s) of guilty the Federal Bureau of Investigation agents have expressed to petitioner that they would, in turn, assure him the government's cooperation and recommendation at the appropriate time for parole consideration." No evidence to support this second allegation was offered, and the Court finds it to be without merit.

**3.** This Court does not see any valid distinction between the kidnapping statute involved in *Jackson* and the bank robbery statute involved here.

resulting therefrom, could probably be avoided.

■ (B) With respect to the other three judgments and sentences, namely, the Silver Spring, San Diego and Las Vegas indictments, the Court finds that the allegations of petitioner, quoted above, are not supported by the evidence. For example, petitioner alleges that he was not in fact guilty of those charges. However, he specifically stated in open court at the time of arraignment that he was guilty of each of those charges, in addition to having voluntarily admitted participation in each of those robberies to the F.B.I. agents in Las Vegas. He did not prove the promises or inducements alleged, and the Court finds that the alleged promises and inducements were not made with respect to any of those three cases.

The other contentions raised by petitioner and his able and sincere court-appointed counsel at the 2255 hearing are not supported by any credible evidence. The Court finds no basis for striking out the Silver Spring, San Diego and Las Vegas indictments.

For the foregoing reasons, petitioner's motion under 28 U.S.C. § 2255 must be and it is hereby denied.