Thomas Bradford **SHAW**, Petitioner,

v.

**UNITED STATES** of America, Respondent.

Civ. A. No. 2348.

United States District Court
S. D. Georgia.

May 7, 1969.

John Tatum, Savannah, Ga., for plaintiff.

Richard Chadwick, Asst. U. S. Atty., Savannah, Ga., for defendant.

## ORDER OF COURT

LAWRENCE, District Judge.

This is a § 2255 proceeding to set aside a life sentence imposed upon Thomas Bradford Shaw in 1956 for violation of the Federal Kidnaping Act. His petition, *pro se*, is based upon United States v. Jackson, 390 U.S. 570, 88 S. Ct. 1209, 20 L.Ed.2d 138 (1968).

Shaw was indicted on November 5, 1955 in the Southern District of Georgia for violation of 18 U.S.C. § 1201(a). He was charged with inveigling, decoying, kidnaping and holding a 14 year old girl on or about August 18, 1954, for coition purposes, and transporting her from Georgia to Virginia and to the District of Columbia and thereafter liberating her physically harmed.[1]

---

1. The same grand jury indicted Shaw on three counts for transporting in interstate commerce by motor vehicle another female [age 16] from the same County in Georgia to other states and to the District of Columbia for the purpose of

At the February, 1956 term Shaw waived arraignment and pleaded guilty to the charges of kidnaping and also certain Mann Act violations as well as to the indictment for interstate transportation of falsely made checks. The pleas in these cases were entered on his behalf on February 14, 1956 by his three court-appointed attorneys, all of them able lawyers experienced in the field of criminal law.

The accused received a life sentence on the kidnaping indictment. He was sentenced to 15 years for the three Mann Act violations and received a 20 year term on the charges of transporting falsely made checks in interstate commerce. The latter two sentences run concurrently with each other and concurrently with the kidnaping sentence. But for the life sentence Shaw would be eligible for parole.

Petitioner asserts that his plea of guilty to the violation of T. 18 § 1201 was "not voluntarily but was made under the influence of fear and threat to his life, to-wit, in order to avoid possible death penalty if found guilty by a jury."

Opposing the motion to vacate, the Government contends:

1. The decision in *Jackson* is to be applied prospectively only.

2. Since the death sentence clause in the Kidnaping Act was always unconstitutional Shaw was never under threat of death and is without standing to contest the sentence imposed.

3. The plea of guilty by Shaw to kidnaping was voluntary and was not the product of fear of the possibility of a death sentence being recommended by a jury.

I

I will first consider the contention that *Jackson* is to be given prospective application only and is not to be retroactively applied.

Title 18, § 1201(a) of the United States Code provides:

"Whoever knowingly transports in interstate * * * commerce, any person who has been unlawfully * * * kidnaped * * * and held for ranson * * * or otherwise * * * shall be punished (1) by death if the kidnaped person has not been liberated unharmed, and if the verdict of the jury shall so recommend, or (2) by imprisonment for any term of years or for life, if the death penalty is not imposed."

In United States v. Jackson, *supra*, it was held that the death penalty clause in this Act is invalid and unenforceable. The Court said:

"Under the Federal Kidnaping Act * * * the defendant who abandons the right to contest his guilt before a jury is assured that he cannot be executed; the defendant ingenious enough to seek a jury acquittal stands forewarned that, if the jury finds him guilty and does not wish to spare his life, he will die."

"The inevitable effect of any such provision is, of course, to discourage assertion of the Fifth Amendment right not to plead guilty and to deter exercise of the Sixth Amendment right to demand a jury trial." *Ibid.*, 581, 88 S.Ct. 1216. However, the statute was held to be not unconstitutional as a whole since the death penalty clause was severable from the rest of the Act.

■ Decisions limiting Supreme Court rulings to prospective application include Linkletter v. Walker, 381 U.S. 618, 85 S.Ct. 1731, 14 L.Ed.2d 601 (1965); Tehan v. United States ex rel. Shott, 382 U.S. 406, 86 S.Ct. 459, 15 L.Ed 2d 453 (1966); Johnson v. New Jersey, 384 U.S. 719, 86 S.Ct. 1772, 16 L.Ed.2d 882 (1966) and Stovall v. Denno, 388 U.S. 293, 87 S.Ct. 1967, 18 L.Ed.2d 1199 (1967). In the latter case the criteria guiding resolution of whether rulings shall be designated as prospective only were summarized. Determination of that question, said the Court, involves weigh-

debauchery. In a third indictment Shaw was charged, in two counts, with know-

ingly transporting falsely made checks in interstate commerce.

ing of such factors as "(a) the purpose to be served by the new standards, (b) the extent of the reliance by law enforcement authorities on the old standards, and (c) the effect on the administration of justice of a retroactive application of the new standards."[2]

Several District Courts have dealt with the question of the retroactivity of *Jackson.*

In Natale v. United States, 287 F. Supp. 96 (D.C.1968) a defendant charged with violation of the Federal Kidnaping Act had entered a plea of guilty and was sentenced to serve ten years. Before the sentence was imposed he had waived indictment. The prisoner subsequently sought vacation of the sentence on the ground that proceedings in capital cases must be by indictment. If *Jackson* were prospective only, the prisoner's position would be well taken. The District Court for Arizona held that at the time the accused waived indictment the capital offence aspect of the Kidnaping Act was unconstitutional since *Jackson* must be given retroactive effect. Judge Craig said that judicial decisions are customarily retrospective except where the highest Court gives a ruling prospective status because "great disruption of the orderly working of the judicial process would result from retroactive application." "*Jackson* is not such a case," said the District Judge. The opinion stated that the number of persons currently in custody for violation of the Kidnaping Act "must be relatively few."[3]

Another District Court decision is United States ex rel. Buttcher v. Yeager, 288 F.Supp. 906 (1968). Petitioner had

entered a plea of non vult to a murder charge in the state courts of New Jersey. He claimed that the law was unconstitutional because the statutory provisions regulating punishment for murder unduly encourage defendants to plead nolo to indictments for that crime since only a life sentence can be imposed on such a plea. The Court considered whether *Jackson* is to be applied retrospectively. Pointing out that if the ruling there were retroactive every convicted murderer in New Jersey who pleaded non vult at the time of trial would be forthwith released from incarceration, Judge Coolahan said he could not "conclude that the *Jackson* decision is retroactive."[4]

The third case was decided in the District Court of Connecticut. See Pindell v. United States, 296 F.Supp. 751, Feb. 12, 1969. Petitioner had pleaded guilty to kidnaping a person who had not been liberated unharmed and had received a term of years. He asserted that the potential death penalty alone and as a matter of law established the presence of coercion. Judge Blumenfeld rejected this contention and dismissed the prisoner's § 2255 petition. The District Judge had clearly indicated in its *Jackson* decision that the effect of the ruling was not retroactive. I think that in the sense in which Judge Blumenfeld used the word he meant no more than that pre-*Jackson* sentences for kidnaping were not automatically rendered invalid. He cited McFarland v. United States, 284 F.Supp. 969 (D.C.1968), a Federal Bank Robbery case in which Chief Judge Thomsen said that the decision in *Jackson* "should not be applied indiscriminately to strike out

2. In DeStefano v. Woods, 392 U.S. 631, 88 S.Ct. 2093, 20 L.Ed.2d 1308 (1968) the Supreme Court, in applying the criteria enunciated in *Stovall* referred to the substantial "adverse effects on the administration of justice of invalidating all serious contempt convictions."

3. On June 30, 1968 the Bureau of Prisons had 201 persons serving time for kidnaping. Statistics are not available as to how many of these prisoners entered pleas

of guilty. On the basis of the accepted statistical percentage of 62%, around 125 of the inmates serving time for kidnaping entered pleas of guilty. In the nature of things, only a few of those cases would involve indictments charging that the kidnaped person was liberated "harmed."

4. Another case involving that State's "non vult" procedure, as viewed in the light of *Jackson,* is Laboy v. New Jersey, (D.C.) 266 F.Supp. 581.

every judgment in a case heretofore entered * * * the totality of the circumstances in each case should be considered to determine whether there was any denial of due process in the light of the development of the law."

■ To that extent *Jackson*, in my opinion, is and must be retroactive. Fundamental constitutional rights are here involved—Shaw's unfettered right not to incriminate one's self and full right to trial by jury. Petitioner asserts that his fear of the death penalty provision, which was as invalid in 1956 as in April, 1968, was the dominant consideration in what he contends amounted to involuntary waiver by him of these guarantees in the Bill of Rights.

In my opinion, *Jackson* should not have a double standard, one for kidnapers after April 7, 1968 and one for those who prior thereto entered pleas on such a charge. The factor of the extent of reliance by law enforcement authorities on the old standards is not involved as far as the Federal Kidnaping Act is concerned and to give the case retroactive application will not materially affect the administration of justice as respects that statute.

I think *Jackson* looks backward as well as forward and so rule.

## II

■ In addition to its position in respect to the prospectiveness issue the Government argues that petitioner cannot challenge the life sentence because he was never under the threat of death since the death penalty provision is and always has been invalid. The basis of Shaw's contention is, as I understand it, that the statute affected his Fifth Amendment right to plead *not* guilty and his Sixth Amendment right to be tried by jury. He contends that these basic rights of an accused were chilled by fear of being sentenced to death if he contested the kidnaping charge. Commenting on the Government's position in this respect, counsel for petitioner in this proceeding dryly observes in his brief, "[T]he fallacy here is that if Shaw had contested his guilt and had been put to death prior to *Jackson*, he certainly could not be resurrected."

The position of the Government in this respect is without merit.

## III

Having decided that *Jackson* is retroactive and that Shaw has standing to challenge the sentence, should it be vacated without further ado? Such is the contention of Shaw's counsel.

I have already indicated that a mere mechanical application of the case, with resulting vitiation of every pre-*Jackson* sentence imposed on guilty pleas prior to April 7, 1968, is not demanded. The death penalty clause was held unconstitutional since it operated as a needless damper upon the exercise of fundamental rights of the accused. But this does not mean that every guilty plea entered on an indictment under the Kidnaping Act was the product of a defendant's fear that a jury might recommend extreme punishment. In other words, the possibility of a death sentence as the result of pleading not guilty may not have been a dominant consideration in the decision of the accused. In *Jackson* the Supreme Court said, "Thus the fact that the Federal Kidnaping Act tends to discourage defendants from insisting upon their innocence and demanding trial by jury hardly implies that every defendant who enters a guilty plea to a charge under the Act does so involuntarily." *Ibid.*, 390 U.S. 583, 88 S.Ct. 1217.

In Alford v. North Carolina, 405 F.2d 340 (4th Cir. 1969) it was held that *Jackson* invalidated that State's statutory scheme under which one accused of a capital crime is faced with the dilemma of risking death in order to assert his rights to jury trial and to plead not guilty, or, alternatively, of pleading guilty to avoid the possibility of capital punishment. Referring to the language of the Supreme Court to the effect that a plea of guilty under the Kidnaping Act

did not automatically mean that the same was involuntary, the Court said:

> "By a parity of reasoning, we think that a defendant who has pleaded guilty when charged with a capital offense in North Carolina is not necessarily entitled to post-conviction relief as a matter of law. *Jackson* by defining what are the impermissible burdens of a statutory scheme like that of North Carolina must be read, however, to hold that a prisoner is entitled to relief if he can demonstrate that his plea was a product of those burdens—specifically, that his principal motivation to plead guilty or to forego a trial by jury was to avoid the death penalty. *Jackson* thus defined a new factor to be given weight in determining the voluntariness of a plea—a factor present in full measure in the instant case because of the North Carolina statutory scheme. As we read *Jackson*, we must determine the extent to which, if at all, petitioner was moved to plead guilty because of the incentive which the North Carolina statutory scheme supplied to achieve that result." [5]

### IV

My attention was called to Alford v. North Carolina after the original hearing on Shaw's motion. Agreeing with the Fourth Circuit in that case, I ordered an evidentiary hearing for the purpose of exploring, in all its ambience, the circumstances of his plea of guilty in 1956.[6] The hearing took place on May 2, 1969.

I will first briefly review Shaw's criminal record, deeming it a part of the setting against which I am to decide whether his decision to plead guilty to kidnaping was a product of impermissible burdens placed by the Kidnaping Act upon his constitutional right to a jury trial and to plead not guilty.

At the time of the alleged kidnaping Shaw was 51 years old. His long criminal record began with a sentence imposed in Tennessee in 1927 of 3 to 5 years for forgery and larceny. Pardoned in 1929, Shaw was sentenced during the same year to 8 years on a forgery charge in Kentucky. A Mann Act violation resulted in a 5 year sentence in 1935.

Following his release in 1939, he received a 20 year state sentence for an armed bank robbery in Florida in 1934. He was paroled in 1944. Subsequently, Shaw was sentenced in a Georgia court to 3 to 5 years on two counts charging larceny of an automobile. He was conditionally released in August, 1953.

During the ensuing two years he left a trail of lechery, bad checks and aliases across this nation. Between March 4, 1954 and July 3, 1955 Shaw is claimed to have passed a total of $19,447 in worthless checks and it is said that he fraudulently obtained $1,642 in merchandise. When the law caught up with him on the early morning of July 13, 1955 at Colorado City, Texas, Shaw was in the company of a teenage girl with whom he had been travelling for a month. At that time a detainer (subsequently withdrawn) was lodged by the State of

---

5. Before I became aware of *Alford* I had reached approximately the same conclusion. I had written at this point in the opinion I was then preparing as follows:

   "The difficulty is in formulating any rules or standards to determine whether the self incrimination of the accused was actually and materially influenced by the knowledge that a guilty plea insured him against the possibility of losing his life if he took a chance with a jury. Is there a reasonable probability that the alleged kidnaper was deterred from pleading *not* guilty because he was afraid he might be executed if he so pleaded. That is the question I asked myself. I realize that

such an approach involves many difficulties and that it would require a case by case determination of every guilty plea entered to an alleged violation of 18 § 1201(a). At any rate, I am going to apply this amorphous test in the present case."

6. At the first hearing on Shaw's motion, March 7, 1969, the prisoner was present but did not testify. His counsel, John Tatum, Esq., took the position at that time that the *Jackson* decision automatically required the life sentence set aside.

Tennessee on the charge of kidnaping another girl of immoral purposes.

Against this lengthy record of crime and recidivism, the charge against Shaw for kidnaping a 14 year old girl for purpose of coition came on for arraignment on February 13, 1956. Shaw's position was not enviable. All the obscene birds of an evil life had come home to roost the same night.

A feral atmosphere pervaded the courtroom on the day of Shaw's arraignment. The first question the Court asked was addressed to the Assistant District Attorney. "It is either one of two things, as I understand it. If he goes to trial it could be the death sentence, is that right?"

The following colloquy then took place:

"THE COURT: I just wanted to get that straight. If he pleads guilty I could give him life and that would be the end of it. If he goes to a jury, the jury could give him either death or life imprisonment, but I can only give him up to life imprisonment.

ASS'T. DIST. ATTORNEY: That's right.

COUNSEL FOR SHAW: The jury could give him death but if the jury doesn't give him the death penalty, then it is up to you to give him any term of years up to life imprisonment.

THE COURT: All right, I just wanted to get the law clear * * *

ASS'T. DIST. ATTORNEY: Your Honor, let me say this, to get it straight, you can impose life imprisonment or any term of years up to life, such as 99 years, on a plea of guilty.

The reason for that would be that under a life sentence he would be eligible for parole in fifteen years, whereas with 99 years he would not be eligible for parole for 33 years.

THE COURT: I could not sentence him to death myself.

ASS'T. DIST. ATTORNEY: I don't think so, Your Honor. I think that would have to be passed upon by a jury.

THE COURT: The only difference between my sentence and the jury is that the jury could give him death and I could not, is that right?

ASS'T. DIST. ATTORNEY: That's right. If the jury recommended death it is mandatory upon the Court to impose the death sentence."

At this point the hearing was recessed until the following day. Meanwhile, Shaw could ponder life as well as death.

The next day a plea of guilty was entered in the kidnaping case. The facts of the crime charged were outlined by an FBI Agent. Then the Judge asked counsel if they desired to make a statement. One of Shaw's attorneys, asking for a light sentence, replied, "I don't know of any statement I could need to make in this case, Your Honor. You have heard the facts." [7]

The prisoner was quoted by one of his counsel as saying "that he didn't know what it is about, that we lawyers could state it." The accused answered affirmatively a question by the Court as to whether he understood that a guilty plea had been entered by his lawyers.

7. The Agent's statement was: "On August 18th, he secured another girl, age 14, and took both of the girls on the pretense of securing them employment in a restaurant in * * *
THE COURT: * * * Why did they both go?
FBI AGENT: One was 16 and she said that he threatened her with a gun. She didn't have too much education.
THE COURT: Well, why did she go with him the second time, if she knew all of this?

FBI AGENT: She said that he threatened to kill her if she told her parents or anybody else. She was the one that was kidnaped, she was under 14 years of age, and he took her to Alexandria, Virginia, and had relations with her. She said that he forced her with a gun to go with him, and that is when the parents reported it to the Sheriff and we started looking for her. And that's the kidnaping charge."

## V

What kind of a case of kidnaping did the Government have? This seems a relevant question. If it was not strong, there was perchance the greater possibility that the guilty plea represented an involuntary waiver of the right to a jury trial and was the product of Shaw's fear of the death penalty.

The record developed at the evidentiary hearing in May, 1969 includes portions of the file of the District Attorney and shows what the prosecution probably would have produced in the way of evidence in proof of the kidnaping charge. The file unfolds a sordid tale of quinquagenarian concupiscence.

On July 13, 1954 petitioner who was originally from Telfair County, showed up in another Georgia county under the name of Eddie Hall. He met the parents of a 16 year old girl and offered her a job as a waitress in a cafeteria at Augusta which he said he owned. We will call the girl Agnes. Her parents told her to take the job and she left home with Shaw in his car. Instead of driving to Augusta he took her to South Carolina where they slept at a motel. Shaw allegedly had sexual intercourse with her by force. From South Carolina the two drove for a week through North Carolina into Tennessee and Ohio. During that period they had sexual relations a number of times. When Shaw took Agnes home she was afraid to tell her parents what she had done. He returned for her the following week and they took a trip up to Ohio and Indiana. Agnes said she was afraid not to accompany him. Along the way Shaw sold chenille bed spreads and bath robes. Agnes claimed that she was again forced to have sexual intercourse. She came home about July 24, 1954.

Shaw came back to the county where the girls lived on August 18, 1954. He had previously seen Agnes in company with a 14 year old friend of hers whom we will call Mildred. Shaw told Agnes that he wanted Mildred to accompany them on a trip and instructed her to help him get her to go along. Otherwise, he would tell on her. They went to Mildred's house and she and Shaw told her mother about working and living conditions at Augusta. Mildred's parents eventually agreed to let her go to Augusta to work for Shaw.

The two girls went off in his car. Instead of going to Augusta he drove to South Carolina. Agnes assured Mildred they were going there to pick up Shaw's sister and allayed her fears concerning Shaw by saying he was "a nice man." From there the three drove to Halifax, N. C. where they spent the night. They then proceeded to Arlington, Va. and registered at a motel, staying in one room. The owner was told by Shaw that the girls were his daughters.

Agnes claimed that she was raped by Shaw at the motel. Mildred was present on the occasion but was too frightened to help her. Thereafter Shaw had forcible relations with Mildred who claimed that she struggled and cried but was told to shut up or he would kill her.

On August 22, 1954 the three visited an amusement park in Washington. While there the girls talked to some young servicemen but Mildred was afraid to tell them what was wrong because Shaw had a knife and had told her he had a pistol. She thought he might hurt the boys. She made no effort to escape at any time because she was confused and frightened and did not know where to go or what to do. Early the following morning Shaw sexually attacked Agnes. Mildred was frightened and pretended to be asleep. He then sent Agnes into the bathroom and again forced Mildred to have relations with him. She struggled and cried. Agnes was afraid to help.

On August 24, 1954 the three drove back to Georgia. When Shaw left the girls he told them to say they had been working at his restaurant in Augusta. He warned Mildred that if she said anything he would tell her friends what she

had done. As soon as Shaw left Mildred told her parents what had happened.[8]

The foregoing is not set forth as *fact* but is an outline of what the Government would probably have produced in the way of testimony to support the kidnaping charge. In an interview with an FBI Agent in the Fall of 1955 Shaw stated that he had carried Agnes out of the state ten or twelve times and that he had had repeated sexual relations with her consent. He claimed that on several occasions Agnes asked him to take Mildred along with them. He denied that he had ever had intercourse with the 14 year old girl and said he was guilty only of "petting." He admitted that he contacted Mildred's parents on the pretext of employment of her at Augusta but claimed that she was fully aware she was not going to that city. In a letter that Shaw wrote to Judge Scarlett in December, 1956, ten months after he was sentenced, he maintained that he was not guilty of kidnaping and complained that he had been given a life sentence "for a weekend Party."

It is, of course, not a function of judges to speculate upon the merits of a prosecution or evaluate the probable testimony of witnesses who never testified and in a case that was never tried. It is not a recommended procedure and I have done so largely because this is a case out of the ordinary run. In commenting upon the strength of the kidnaping charge I realize that I am dealing, long after an event, with mere theory while Shaw and his attorneys in 1956 were confronted by the hard facts of a hard case.

As far as Mildred is concerned, everything fitted rather neatly into the four corners of the Kidnaping Act. If she was not kidnaped in the ordinary sense of the word, she was "inveigled" or "decoyed" within the language of the statute. She was transported to another state by the defendant. If she was not "held for ransom," she was held "otherwise", that is to say, for the purpose of coition. If she was not physically held or forcibly kept she was "held" through fear and when she was liberated she was not freed "unharmed" since Shaw had had forcible sexual relations with her.

■ As far as Federal criminal law is concerned the Government's case against Shaw seems to me to have much greater resemblance to a Mann Act violation than a kidnaping charge. The only difference between the case of Agnes and that of Mildred was the larger element of consensuality in the former. If the facts fell within the letter of the Kidnaping Act, they were hardly within its spirit. In Chatwin v. United States, 326 U.S. 455 at 464, 66 S.Ct. 233 at 237, 90 L.Ed. 198 (1946) the Supreme Court pointed out:

> "Nor is there any indication that Congress desired or contemplated that the punishment of death or long imprisonment, as authorized by the Act, might be applied to those guilty of immoralities lacking the characteristics of true kidnapings. In short, the purpose of the Act was to outlaw interstate kidnapings rather than general transgressions of morality involving the crossing of state lines. And the broad language of the statute must be interpreted and applied with that plain fact in mind."

Was Mildred "held" by Shaw within the meaning of the language of the Act? To be sure, she was inveigled or decoyed outside the State but a potent argument could have been made that at the time she was "harmed" by sexual assault at Arlington she was not being forcibly "held" as a *kidnaped* person. The two girls attended movies by themselves and, as already stated, visited an amusement park at Washington. The owner of the motel told the FBI that they were alone

---

8. When Mildred did not return home on time her father ascertained that there was no restaurant of the name given by Shaw and went to Augusta to look for her. There is an undelivered letter written by Mildred's mother on August 24, 1954 in which she said, "And do you blame us for being worried about our little girl? You know you mean more to us than all the money in the world * * *"

at least one day and that both seemed "happy."

Where guilt of a capital offence was dubious what prompted Shaw to plead guilty? Was his decision to do so motivated by fear of what a jury might do in a case which, if weak in law, possessed in its factual aspects strong appeal to the prejudices and emotions of jurors?

## VI

At the evidentiary hearing on May 2, 1969 answer was sought to the question of the voluntariness of Shaw's guilty plea and the extent to which, if at all, he was moved to plead guilty because of the statutory incentive to achieve that result.

Shaw testified that he told his attorneys he was not guilty of the kidnaping charge. He wanted to "fight it." He was informed that if he went to trial he would probably get the death penalty. His daughter-in-law visited him at the instance of counsel and urged him to plead guilty. He yielded to the advice of his attorneys and, contrary to his wishes, permitted them to plead guilty for him.

One of the lawyers appointed to represent Shaw in 1955 testified at the hearing. He generally confirmed his contentions about the plea. He recalled that Shaw insisted that he was not guilty of the kidnaping charge. He claimed that the trip to Virginia was a "weekend party." Counsel were aware that the Assistant District Attorney was going to ask the extreme penalty in event of trial by jury. Because of the youthful age of the girl involved and Shaw's criminal record his attorneys were fearful of what a jury might do. They had talked to one of the FBI investigators who informed counsel that force had been used by the accused. Shaw was strongly urged to enter a guilty plea. The poor state of his health was a factor in the advice. However, the dominant and major consideration in his decision to plead guilty was the risk of a death sentence.

The only other evidence adduced at the hearing was the production by the District Attorney of the Government's investigation file in the kidnaping charge. Both sides agreed that the Court might resort to it in passing upon the motion to set the life sentence aside.

## VII

██ I am satisfied from all the evidence that fear of being executed was an impelling influence in Shaw's decision to plead guilty. Two choices confronted the accused. He could forego trial by jury, plead guilty and live. Or he could plead not guilty, stand trial and have the spectre of death sitting in with the jurors.[9] The pale rider had no business in the jury box. The Fifth and Sixth Amendments contemplate the full exercise and the complete enjoyment by accused persons of the guarantees contained therein. The death sentence clause in the Kidnaping Act, deemed valid in 1956, diluted Petitioner's constitutional rights. A plea that was voluntary on its face became involuntary in fact because of the coercive effect of possible capital punishment which should not have confronted the accused in making up his mind how to plead. The life sentence was void and must be vacated.

Petitioner will be re-arraigned prior to the August Term unless before that time the kidnaping charge is nol-prossed or unless there should be an appeal. In any event, my ruling will not result in Shaw's immediate release as he is serving time for the violations of the Mann Act and Title 18, § 2314.

9. In Pindell v. United States, *supra*, the District Court said "Petitioner's claim is undercut by the fact that he did not have to plead guilty to avoid a possible death penalty. He could have elected trial by judge." I am not at all sure about this. An accused has no absolute right to a trial before a judge and may be so tried only when the government and the court concur. Dixon v. United States, 110 U.S.App.D.C. 275, 292 F.2d 768. See Rule 23(a), Fed.R.Crim.P. In the Southern District of Georgia the Judge sitting as jury in a criminal case has been and is an exception. A few months ago I refused to sit as trior in an unarmed bank robbery case in which the accused sought to waive trial by jury.