## CHATWIN *v.* UNITED STATES.

NO. 31.

Argued October 10, 1945.—Decided January 2, 1946.

*Mr. Claude T. Barnes,* with whom *Messrs. Ed. D. Hatch* and *O. A. Tangren* were on the brief, for petitioners.

*Assistant Solicitor General Judson,* with whom *Messrs. W. Marvin Smith, Robert S. Erdahl* and *Miss Beatrice Rosenberg* were on the brief, for the United States.

MR. JUSTICE MURPHY delivered the opinion of the Court.

The Federal Kidnaping Act[1] punishes any one who knowingly transports or aids in transporting in interstate or foreign commerce "any person who shall have been un-

---

[1] 47 Stat. 326; 48 Stat. 781; 18 U. S. C. § 408a.

lawfully seized, confined, inveigled, decoyed, kidnaped, abducted, or carried away by any means whatsoever and held for ransom or reward or otherwise, except, in the case of a minor, by a parent thereof." The sole issue confronting us in these cases is whether the stipulated facts support the convictions of the three petitioners under this Act, the indictment having charged that they unlawfully inveigled, decoyed and carried away a minor child of the age of 15, held her for a stated period, and transported her from Utah to Arizona with knowledge that she had been so inveigled and held. We are not called upon to determine or characterize the morality of their actions. Nor are we concerned here with their liability under any other statute, federal or state.

Petitioners are members of the Fundamentalist cult of the Mormon faith, a cult that sanctions plural or "celestial" marriages. In August, 1940, petitioner Chatwin, who was then a 68-year old widower, employed one Dorothy Wyler as a housekeeper in his home in Santaquin, Utah. This girl was nearly 15 years old at this time although the stipulation indicates that she had only a mental age of 7.[2] Her employment by Chatwin was approved by her parents. While residing at Chatwin's home, the girl was continually taught by Chatwin and one Lulu Cook, who also resided there, that plural marriage was essential to her salvation. Chatwin also told her that it was her grandmother's desire that he should take her in celestial marriage and that such a marriage was in conformity with the true principles of the original Mormon Church. As a result of these teachings, the girl was converted to the principle of celestial marriage and entered into a cult marriage with Chatwin

---

[2] At the time of her employment by Chatwin, the girl's physical age was 14 years and 8 months; her mental age was 7 years and 2 months; her intelligence quotient was 67. At the time of the stipulation in March, 1944, she was a "high grade moron" with a mental age of 9 years and 8 months and an intelligence quotient of 64.

on December 19, 1940. Thereafter she became pregnant, which fact was discovered by her parents on July 24, 1941. The parents then informed the juvenile authorities of the State of Utah of the situation and they took the girl into custody as a delinquent on August 4, 1941, making her a ward of the juvenile court.

On August 10, 1941, the girl accompanied a juvenile probation officer to a motion picture show at Provo, Utah. The officer left the girl at the show and returned later to call for her. The girl asked to be allowed to stay on for a short time and the officer consented. Thereafter, and prior to the second return of the officer, the girl "left the picture show and went out onto the street in Provo." There she met two married daughters of Chatwin who gave her sufficient money to go from Provo to Salt Lake City. Shortly after arriving there she was taken to the home of petitioners Zitting and Christensen. They, together with Chatwin, convinced her that she should abide, as they put it, "by the law of God rather than the law of man" and that she was perfectly justified in running away from the juvenile court in order to live with Chatwin. They further convinced her that she should go with them to Mexico to be married legally to Chatwin and then remain in hiding until she had reached her majority under Utah law. Thereafter, on October 6, 1941, the three petitioners transported the girl in Zitting's automobile from Salt Lake City to Juarez, Mexico, where she went through a civil marriage ceremony with Chatwin on October 14. She was then brought back to Utah and thence to Short Creek, Arizona. There she lived in hiding with Chatwin under assumed names until discovered by federal authorities over two years later, December 9, 1943. While in Short Creek she gave birth to two children by Chatwin. The transportation of the girl from Provo to Salt Lake City, thence to Juarez, Mexico, and finally to Short Creek was without the consent and against the wishes of her

parents and without authority from the juvenile court officials.[3]

Having waived jury trials, the three petitioners were found guilty as charged and were given jail sentences. 56 F. Supp. 890. The court below affirmed the convictions. 146 F. 2d 730. We granted certiorari, 324 U. S. 835, because of our doubts as to the correctness of the judgment that the petitioners were guilty under the Federal Kidnaping Act on the basis of the foregoing facts.

The Act by its own terms contemplates that the kidnaped victim shall have been (1) "unlawfully seized, confined, inveigled, decoyed, kidnaped, abducted, or carried away by any means whatsoever" and (2) "held for ransom or reward or otherwise." The Government contends that both elements appear from the stipulated facts in this case. The petitioners, it is argued, unlawfully "inveigled" or "decoyed" the girl away from the custody of her parents and the juvenile court authorities, the girl being "incapable of understanding the full significance of petitioners' importunities" because of her tender years and extremely low mentality. It is claimed, moreover, that the girl was "held" during the two-month period from August 10 to October 6, 1941, prior to the legal marriage, for the purpose of enabling Chatwin to cohabit with her and that this purpose, being of "benefit to the transgressor," is within the statutory term "or otherwise" as defined in *Gooch* v. *United States,* 297 U. S. 124, 128.

We are unable to approve the Government's contention. The agreed statement that the girl "left the picture show and went out onto the street in Provo" without any apparent motivating actions by the petitioners casts serious doubts on the claim that they "inveigled" or "decoyed" her

---

[3] In *Chatwin* v. *Terry,* 107 Utah 340, 153 P. 2d 941 (1944), the Utah Supreme Court held that the juvenile court had authority to hold the girl in custody until she reached the age of 21, despite her legal marriage to Chatwin.

away from the custody of the juvenile court authorities. But we do not pause to pursue this matter for it is obvious that there has been a complete lack of competent proof that the girl was "held for ransom or reward or otherwise" as that term is used in the Federal Kidnaping Act.

The act of holding a kidnaped person for a proscribed purpose necessarily implies an unlawful physical or mental restraint for an appreciable period against the person's will and with a willful intent so to confine the victim. If the victim is of such an age or mental state as to be incapable of having a recognizable will, the confinement then must be against the will of the parents or legal guardian of the victim. In this instance, however, the stipulated facts fail to reveal the presence of any of these essential elements.

(1) There is no proof that Chatwin or any of the other petitioners imposed at any time an unlawful physical or mental restraint upon the movements of the girl. Nothing indicates that she was deprived of her liberty, compelled to remain where she did not wish to remain, or compelled to go where she did not wish to go. For aught that appears from the stipulation, she was perfectly free to leave the petitioners when and if she so desired. In other words, the Government has failed to prove an act of unlawful restraint.

(2) There is no proof that Chatwin or any of the other petitioners willfully intended through force, fear or deception to confine the girl against her desires. While bona fide religious beliefs cannot absolve one from liability under the Federal Kidnaping Act, petitioners' beliefs are not shown to necessitate unlawful restraints of celestial wives against their wills. Nor does the fact that Chatwin intended to cohabit with the girl and to live with her as husband and wife serve as a substitute for an intent to restrain her movements contrary to her wishes, as required by the Act.

(3) Finally, there is no competent or substantial proof that the girl was of such an age or mentality as necessarily to preclude her from understanding the doctrine of celestial marriage and from exercising her own free will, thereby making the will of her parents or the juvenile court authorities the important factor. At the time of the alleged inveiglement in August, 1941, she was 15 years and 8 months of age and the alleged holding occurred thereafter. There is no legal warrant for concluding that such an age is ipso facto proof of mental incapacity in view of the general rule that incapacity is to be presumed only where a child is under the age of 14. 9 Wigmore on Evidence (3rd ed.) § 2514.[4] Nor is there any statutory warrant in this instance for holding that the consent of a child of this age is immaterial. Cf. *In re Morrissey,* 137 U. S. 157; *United States* v. *Williams,* 302 U. S. 46; *State* v. *Rhoades,* 29 Wash. 61, 69 P. 389. In Utah, parenthetically, any alleged victim over the age of 12 is considered sufficiently competent so that his consent may be used by an alleged kidnaper in defense to a charge under the state kidnaping statute. Utah Code Ann. (1943) § 103–33–2. And a person over the age of 14 in Utah is stated to be capable of committing a crime, the presumption of incapacity applying only to those younger. § 103–1–40. *Sadleir* v. *Young,* 97 Utah 291, 85 P. 2d 810; *State* v. *Terrell,* 55 Utah 314, 186 P. 108.

Great stress is placed by the Government, however, upon the admitted fact that the girl possessed a mental

---

[4] See *Commonwealth* v. *Nickerson,* 87 Mass. 518 (child of 9 held incompetent to assent to forcible transfer of custody); *State* v. *Farrar,* 41 N. H. 53 (child of 4 held incapable of consenting to forcible seizure and abduction); *Herring* v. *Boyle,* 1 C. M. & R. 377 (child of 10 could not recover for false imprisonment without proof that he knew of alleged restraint upon him); *In re Lloyd,* 3 Man. & Gr. 547 (child between 11 and 12 held competent to decide whether to live with father or mother).

age of 7 in 1940, one year before the alleged inveiglement and holding. It is unnecessary here to determine the validity, the reliability or the proper use of mental tests, particularly in relation to criminal trials. It suffices to note that the method of testing the girl's mental age is not revealed and that there is a complete absence of proof in the record as to the proper weight and significance to be attached to this particular mental age. Nothing appears save a bare mathematical approximation unrestricted in terms to the narrow legal issue in this case. Under such circumstances a stipulated mental age of 7 cannot be said necessarily to preclude one from understanding and judging the principles of celestial marriage and from acting in accordance with one's beliefs in the matter. The serious crime of kidnaping should turn on something more substantial than such an unexplained mathematical approximation of the victim's mental age. There must be competent proof beyond a reasonable doubt of a victim's mental incapacity in relation to the very acts in question before criminal liability can be sanctioned in a case of this nature.[5]

The stipulated facts of this case reveal a situation quite different from the general problem to which the framers of the Federal Kidnaping Act addressed themselves. This statute was drawn in 1932 against a background of organized violence. 75 Cong. Rec. 13282–13304. Kidnaping by that time had become an epidemic in the United States. Ruthless criminal bands utilized every known legal and scientific means to achieve their aims and to protect them-

---

[5] See *State* v. *Kelsie*, 93 Vt. 450, 108 A. 391; *State* v. *Schilling*, 95 N. J. L. 145, 112 A. 400; *People* v. *Oxnam*, 170 Cal. 211, 149 P. 165; *State* v. *Schafer*, 156 Wash. 240, 286 P. 833; *Commonwealth* v. *Stewart*, 255 Mass. 9, 151 N. E. 74; *Commonwealth* v. *Trippi*, 268 Mass. 227, 167 N. E. 354; Woodbridge, "Physical and Mental Infancy in the Criminal Law," 87 U. of Pa. L. Rev. 426.

selves. Victims were selected from among the wealthy with great care and study. Details of the seizures and detentions were fully and meticulously worked out in advance. Ransom was the usual motive. "Law enforcement authorities, lacking coordination, with no uniform system of intercommunication and restricted in authority to activities in their own jurisdiction, found themselves laughed at by criminals bound by no such inhibitions or restrictions . . . The procedure was simple—a man would be kidnapped in one State and whisked into another, and still another, his captors knowing full well that the police in the jurisdiction where the crime was committed had no authority as far as the State of confinement and concealment was concerned." Fisher and McGuire, "Kidnapping and the So-called Lindbergh Law," 12 New York U. L. Q. Rev. 646, 653. See also Hearing before the House Committee on the Judiciary (72d Cong., 1st Sess.) on H. R. 5657, Serial 4; Finley, "The Lindbergh Law," 28 Georgetown L. J. 908.

It was to assist the states in stamping out this growing and sinister menace of kidnaping that the Federal Kidnaping Act was designed. Its proponents recognized that where victims were transported across state lines only the federal government had the power to disregard such barriers in pursuing the captors. H. Rep. No. 1493 (72d Cong., 1st Sess.); S. Rep. No. 765 (72d Cong., 1st Sess.). Given added impetus by the emotion which gripped the nation due to the famous Lindbergh kidnaping case, the federal statute was speedily adopted. See 75 Cong. Rec. 5075–5076, 13282–13304. Comprehensive language was used to cover every possible variety of kidnaping followed by interstate transportation. Armed with this legislative mandate, federal officials have achieved a high and effective control of this type of crime.

But the broadness of the statutory language does not permit us to tear the words out of their context, using the magic of lexigraphy to apply them to unattractive or immoral situations lacking the involuntariness of seizure and detention which is the very essence of the crime of kidnaping. Thus, if this essential element is missing, the act of participating in illicit relations or contributing to the delinquency of a minor or entering into a celestial marriage, followed by interstate transportation, does not constitute a crime under the Federal Kidnaping Act. No unusual or notorious situation relating to the inability of state authorities to capture and punish participants in such activities evidenced itself at the time this Act was created; no authoritative spokesman indicated that the Act was to be used to assist the states in these matters, however unlawful and obnoxious the character of these activities might otherwise be. Nor is there any indication that Congress desired or contemplated that the punishment of death or long imprisonment, as authorized by the Act, might be applied to those guilty of immoralities lacking the characteristics of true kidnapings. In short, the purpose of the Act was to outlaw interstate kidnapings rather than general transgressions of morality involving the crossing of state lines. And the broad language of the statute must be interpreted and applied with that plain fact in mind. See *United States* v. *American Trucking Associations,* 310 U. S. 534, 543–544.

Were we to sanction a careless concept of the crime of kidnaping or were we to disregard the background and setting of the Act the boundaries of potential liability would be lost in infinity. A loose construction of the statutory language conceivably could lead to the punishment of anyone who induced another to leave his surroundings and do some innocent or illegal act of benefit to the former, state lines subsequently being traversed. The absurdity of such a result, with its attendant likelihood of unfair

punishment and blackmail, is sufficient by itself to fore-close that construction.

The judgment of the court below affirming the convictions of the petitioners must therefore be

*Reversed.*

MR. JUSTICE BURTON concurs in the result.

MR. JUSTICE JACKSON took no part in the consideration or decision of these cases.