STATE of Iowa, Appellee,

v.

Marvin Allen MEAD, Appellant.

No. 64124.

Supreme Court of Iowa.

April 21, 1982.

Francis C. Hoyt, Jr., Appellate Defender, and Patrick R. Grady, Asst. Appellate Defender, Des Moines, for appellant.

Thomas J. Miller, Atty. Gen., Shirley Ann Steffe, Asst. Atty. Gen., and William E. Davis, Scott County Atty., for appellee.

Considered by REYNOLDSON, C. J., and UHLENHOPP, McCORMICK, ALLBEE, and McGIVERIN, JJ.

UHLENHOPP, Justice.

The principal problem in this appeal relates to the meaning of the word "confines" in our kidnapping statute, section 710.1, The Code 1979.

The jury could find the facts as follows. On April 15, 1979, Jovita Zamora (Jovita) and her mother, Angela Zamora (Mrs. Zamora), returned to Mrs. Zamora's home after having Easter dinner with relatives. Jovita testified:

A. Yes, when I opened the door for my mother to go in, she didn't go in, because someone was in that entrance. The minute that I opened the door, I thought my mother would step up, but she didn't, then this young man stepped out of there.

Q. Off the porch? A. Out of the inside of the entrance porch.

Q. And what happened then? A. Then my mother questioned him and asked him what he was doing in the house.

Q. Were you present during this? A. Yes.

Q. Do you recall what his response was? A. Yes.

Q. What was it? A. He said he was knocking on the door.

. . . .

Q. Okay. How long did this conversation go on? A. He asked us if we were the people that lived there at that house, and we said yes, then we didn't stay there by that door, we proceeded to walk on to the front door.

. . . .

Q. What did the man that was there do? A. He walked along with us.

Q. Beside you, in front of you, or behind you? A. Alongside of us.

Q. Was the conversation still going on at this time? A. The conversation was going on; he was asking questions about the neighborhood.

. . . .

Q. Okay. What happened then? A. He stepped alongside of us, and he just stood there, and he did tell us that that's

who he was looking for, Cheryl Weeks, and I was carrying a few empty dishes in a box, and I set them down on the front step. When I turned over to set it down, then that's when he grabbed my mother from the back.

Q. Okay. Would you describe to the Jury how he did this? A. As I set this box down, he grabbed my mother with his left hand, and then he held a knife to her throat, and he kept—he said, "This woman is dead," and I couldn't believe it when he said that—

. . . .

Q. Would you describe what you observed in his hand? A. He had a shiny blade to my mother's neck, which I was positive was a knife.

Q. Did he say, "This woman is dead" just once? A. No, he repeated it, because—I guess I was shocked, I didn't—he repeated it again, "This woman is dead." My mother started screaming then.

Q. What occurred then? A. My mother told me—she said, "Look what he is holding to my neck." I thought, "Well, he is much stronger than I," but I went ahead and sort of hit him on the arm, on the right arm, and I said, "No, don't." And I don't know whether my mother raised her arms then or—she freed herself and she ran for help.

Q. As your mother freed herself and ran for help, what occurred? A. He then struck me in the face, and as he struck me, I fell to the ground. I landed with my right hip on the concrete, which I had a great big bruise there. When he hit me—

Q. Let me stop you for a second. When you say that he struck you, how did he strike you? With what? A. He used his fist.

. . . .

Q. Was he attempting to do anything at the time he struck you? A. At the time, yes, he had told me to let go of my purse, and I wouldn't let go of my purse, I held on to it.

Q. Was he also holding on to it? A. He was holding on to it too. I must have frozen in the spot, thinking that it was my purse and my belongings, and why should he want to take it away from me.

Q. After he hit you, what happened? A. After he hit me, then I fell, then he kicked me on my left arm. That bruise was even a lot worse than the one I had on my face.

Q. Were you still holding on to your purse? A. The purse strap broke then, and I was hanging on, but that's when he got it away from me.

Q. After he kicked you? A. Right.

Q. Can you tell whether this was a deliberate kick, as opposed to just pulling away? A. No, he wanted to hurt me, so I would let go of that purse.

Q. After he kicked you and got ahold of the purse, what happened? A. Then I saw him running—I got up, and I saw him running towards the back of the house, past the garden—we have a garden there—and all I thought was, "Well, he's gone with my purse," and then I remembered—my mother was at the neighbor's screaming yet, I could hear her hollering and screaming, so I went over and tried to calm her down, because she was really upset.

Q. When he left, he took your purse with him? A. Right, he had my purse with him.

Mrs. Zamora testified similarly. The State introduced other evidence about a knife and also about pry marks by the door of the house.

Defendant Marvin Allen Mead was apprehended, identified as the individual involved in the incident, and charged in three counts with second-degree kidnapping, first-degree burglary, and assault while participating in a felony. He was convicted on those charges and sentenced to twenty-five years each on the first two of them and five years on the third one, to run consecutively for a total of fifty-five years.

Defendant appealed. He minimally but sufficiently preserved error on the grounds he asserts on appeal. *State v. Allison*, 206

N.W.2d 893, 894 (Iowa 1973); *State v. Miskell*, 247 Iowa 678, 683, 73 N.W.2d 36, 39 (1955).

We transferred the appeal to the Court of Appeals. By divided vote that court affirmed the kidnapping and burglary convictions but reversed on the assault charge and ordered it dismissed. We granted further review on the parties' applications.

I. *Kidnapping*. Our kidnapping statute provides in section 710.1(2), The Code 1979:

A person commits kidnapping when he or she either confines a person or removes a person from one place to another, knowing that he or she has neither the authority nor the consent of the other to do so; provided, that to constitute kidnapping the act must be accompanied by one or more of the following:

. . . .

2. The intent to use such person as a shield or hostage.

. . . .

Under that section, a defendant must confine a person or remove a person from one place to another. The State claims that defendant confined Mrs. Zamora when he grabbed her around the neck. Defendant contends that "confines" in the statute contemplates a greater restraint than occurred here. A removal is not involved.

The parties' dispute raises again the basic question of the scope of the crime of kidnapping. We have confronted this problem on several occasions, and our present task is to fit this case into the pattern of those decisions. *State v. Holderness*, 301 N.W.2d 733 (Iowa 1981); *State v. Rich*, 305 N.W.2d 739 (Iowa 1981); *State v. Knupp*, 310 N.W.2d 179 (Iowa 1981); *State v. Marr*, 316 N.W.2d 176 (Iowa 1982).

The factual recitation in *Holderness* includes the following:

On August 26, 1978, a ten-year-old girl was abducted while in a Davenport cemetery. After luring the girl from her bicycle to his car, the assailant choked her, partially removed her pants and "did some things" to her which she could not remember. The assailant also struck her on the head several times with both a club and his fist. Following this episode, he transported the victim out into the country, where she was subjected to various incidents of sexual abuse while still confined in the assailant's car. She was later released when he returned her to the cemetery.

301 N.W.2d at 736. We stated:

We believe the facts and circumstances of this case are sufficient to support the conclusion that the confinement and movement involved were not merely incidental to the crime of sexual abuse, and that the offense of kidnapping was amply established.

*Id.* at 740.

In *Rich* a shopping center custodian in a mall told the female victim, after hours, that she would have to use another exit. The two walked toward that exit and the custodian grabbed the victim from behind, held a sharp object to her back and told her she would not get hurt if she did as told, led her to the men's restroom, forced her to lie on her stomach, tied her hands behind her back, and sexually abused her. He then led her around the shopping center, laid her on her back and tied her legs to a bannister with her brassiere and a rag, later untied her legs, put her in a three-wheeled trash container and covered her with trash, wheeled her to a utility shed, left, returned, tied her feet, subsequently wheeled her into the mall area again, and departed. The victim later escaped.

After extensively reviewing the split of authority on the confinement-removal issue, *contrast People v. Levy*, 15 N.Y.2d 159, 204 N.E.2d 842, 256 N.Y.S.2d 793 (1965), *to State v. Jacobs*, 93 Ariz. 336, 380 P.2d 998, *cert. denied*, 375 U.S. 46, 84 S.Ct. 158, 11 L.Ed.2d 108 (1963), and considering the general rules of construction of criminal statutes, we held:

Applying these principles of construction, we conclude that our legislature, in enacting section 710.1, intended the terms "confines" and "removes" to require more than the confinement or removal that is an inherent incident of commission of the

crime of sexual abuse. Although no minimum period of confinement or distance of removal is required for conviction of kidnapping, the confinement or removal must definitely exceed that normally incidental to the commission of sexual abuse. Such confinement or removal may exist because it substantially increases the risk of harm to the victim, significantly lessens the risk of detection, or significantly facilitates escape following the consummation of the offense.

305 N.W.2d at 745.

*Knupp* involved this factual situation:

In her high heels she had trouble traversing the icy Mississippi River bridge and accepted a ride with defendant. She left his car at the tollbooth and resumed walking.

Defendant returned, stopped his car about five feet from the curb, opened the passenger door, and again asked the victim if she wanted a ride. She stepped into the street to answer the defendant, put her right hand on the car roof, and told defendant he was a "nice guy" but she did not want a ride. Defendant seized the victim's arm, pulled her into the car, and drove away. Apparently no one heard the victim's scream. Defendant told her he just wanted to make sure she got home safely. When he asked where she lived she replied that he could let her out at the Benson Lumber Company. During this travel the victim told defendant she had quarreled with her husband and that she was pregnant. She later characterized her reaction as "scared" and "babbling."

Defendant drove six or seven blocks toward the lumber company, but turned in at the Yetter Oil Company parking lot and stopped under an overpass bridge. The victim got out of the car. In the ensuing ten-minute struggle, defendant punched her in the stomach several times and she was shoved back into the front seat. As a preliminary to a resulting sex act defendant produced a knife and used it to cut through her body suit.

After the sex act the victim put on her blue jeans and walked the short distance to her home.

310 N.W.2d at 181. We reviewed *Holderness* and *Rich* and held:

Applying the criteria we have identified in our opinions as aiding in the resolution of the removal issue, we hold this confinement and removal was kidnapping within section 710.1. Defendant's actions substantially exceeded that which could have been considered merely incidental to the sexual abuse, substantially increased the risk of harm to the victim, and significantly lessened the risk of detection.

*Id.* at 183.

In *Marr* the facts were these:

The victim had left her apartment house around 10:00 p. m. to walk to a nearby drug store. Upon leaving the store, she noticed a man—whom she later identified as the defendant—sitting in a car and staring at her. While walking back to her apartment she heard a car door slam and observed the defendant following her at a distance of fifty feet. She picked up her pace, and he began to run after her; when she began to run too, he yelled "Hey wait a minute," and she stopped and turned around to face him. She screamed and he clamped his hand over her mouth, threatening her "not to scream, or [she] would never scream again." At this point the two were on the sidewalk directly in front of the victim's apartment house, which abutted the sidewalk. The defendant slammed her against the corner of the building, and then shoved her down to the ground around to the side of the building, some ten to fifteen feet into a gangway separating it from a neighboring house. One of her arms was pinned under her back, allowing the defendant to lift her shirt, pull down her pants, and sexually abuse her. Although she believed he had a knife, the defendant apparently did not have any kind of weapon in his possession. She could not scream or breathe easily because he clutched her throat; in fact he applied so much pressure that she

almost lost consciousness. Alerted by a noise outside the apartment, the victim's husband entered the gangway and interrupted the attack, which had lasted two or three minutes.

316 N.W.2d at 177. We held:

We conclude the State failed to sustain its burden of proof under the kidnapping charge that the confinement or removal definitely exceeded that normally incidental to the commission of sexual abuse.

*Id.* at 180.

■ We now hold that unless we extend kidnapping to nearly any case involving a seizure by a defendant of another person during the commission of a crime, which we refuse to do, the instant case does not involve sufficient confinement to constitute kidnapping. As the United States Supreme Court stated regarding the federal kidnapping act in *Chatwin v. United States*, 326 U.S. 455, 464, 66 S.Ct. 233, 237, 90 L.Ed. 198, 203 (1946): "Were we to sanction a careless view of the crime of kidnapping or were we to disregard the background and setting of the Act the boundaries of potential liability would be lost in infinity." The Michigan Court of Appeals concretely expressed the same thought in *People v. Adams*, 34 Mich. App. 546, 557, 192 N.W.2d 19, 24 (1971), *aff'd*, 389 Mich. 222, 205 N.W.2d 415 (1973):

It will be observed that the statute makes no reference to the duration or circumstances of the confinement. Literally construed, the statute leads to absurd results. The trespasser who momentarily locks a caretaker in his cottage is placed on the same footing as the professional criminal who invades a home, seizes the occupants at gunpoint, transports them to a secret hideout, and holds them for ransom. The robber who orders his victim to stand motionless while his wallet is removed is guilty of the same crime as the robber who forces his victim to drive for miles to a deserted location, where he is terrorized and abandoned. A group of college students who invade a dean's office, wrongfully confining its occupants, commit the same offense as a gang of rapists who seize a woman and remove her from her family to a place of isolation.

*See also Aikerson v. State*, 274 So.2d 124, 127 (Miss.1973) ("This would mean that any person who seized and held another in a fist fight or seized, hugged and kissed a woman without her consent, would be guilty of kidnapping."); *Mobley v. State*, 409 So.2d 1031, 1034 (Fla.1982) ("The prevalent view nationwide is that kidnapping statutes, regardless of their wording, do not apply to unlawful confinements or movements incidental to other felonies. Most courts have reasoned that the legislature did not intend for the statutes to be literally applied. Some reasoned that a narrow construction of the statutes was necessary to prevent the abuse of prosecutorial discretion. One court has suggested that a literal application of its kidnapping statute would be a violation of due process." Kidnapping conviction upheld where defendants held hostages in cell during prison riot.).

We are impressed by the distinction between "seizure" and "detention" (which the court equated to confinement) drawn by the court in *Hardie v. State*, 140 Tex.Cr. 368, 377, 144 S.W.2d 571, 575 (1940). The present case involves a seizure of Mrs. Zamora by defendant, not a confinement of her. Under the statute, kidnapping cannot be predicated on merely "seizing" another person. The trial court should have dismissed the kidnapping count.

II. *Merger.* Defendant next contends that two mergers occurred in this case by virtue of section 701.9, The Code 1979:

No person shall be convicted of a public offense which is necessarily included in another public offense of which the person is convicted. If the jury returns a verdict of guilty of more than one offense and such verdict conflicts with this section, the court shall enter judgment of guilty of the greater of the offenses only.

Relevant also are rules 6(1) and (2) of the Iowa Rules of Criminal Procedure:

1. *Multiple offenses.* When the conduct of a defendant may establish the commission of more than one public offense arising out of the same transaction

or occurrence, the defendant may be prosecuted for each of such offenses. Each of such offenses may be alleged and prosecuted as a separate count in a single complaint, information or indictment, unless, for good cause shown, the trial court in its discretion determines otherwise. Where the public offense which is alleged carries with it certain lesser included offenses, the latter should not be charged, and it is sufficient to charge that the accused committed the major offense.

2. *Prosecution and judgment.* Upon prosecution for a public offense, the defendant may be convicted of either the public offense charged or an included offense, but not both.

A. The State charged defendant with kidnapping and assault while participating in a felony—the kidnapping and the burglary. Defendant first contends that when he was convicted of kidnapping, the assault charge based on participating in the kidnapping merged into the kidnapping charge so that he could not also be convicted of the assault based on the kidnapping. No necessity exists to decide this question because we have held that the kidnapping conviction cannot stand.

■ B. As to the charge of assault based on participating in the burglary, defendant first claims that in any event the State had to establish, in addition to the other elements, both the kidnapping and the burglary because that is the way the assault was charged, citing *State v. Hochmuth*, 256 Iowa 442, 127 N.W.2d 658 (1964). This is a misreading of *Hochmuth*. If the State's only assault charge here were assault while participating in kidnapping, the State could not convict defendant of the assault by establishing assault while participating in burglary; then *Hochmuth* would apply. But since the State charged assault while participating in kidnapping and burglary, and since kidnapping and burglary are both felonies, the State can establish the element of "participating in a felony" by proving either the kidnapping or the burglary.

■ For his second merger claim, defendant advances the novel proposition that a conviction of assault while participating in burglary does not permit a conviction of the burglary also. He arrives at that result by two routes.

Defendant first contends that to be convicted of assault while participating in burglary, a person must be found to have committed burglary; therefore burglary is necessarily included in the assault. Defendant's problem is with his premise: that a person must be found to have committed burglary.

Included offenses are ascertained by the familiar two-step test—legal and factual—set out in such cases as *State v. Sangster*, 299 N.W.2d 661, 663 (Iowa 1981). We need only consider the legal step. Under that step, the question is whether the greater offense cannot be committed without committing the lesser offense. *Id.* at 663 ("The lesser offense is necessarily included in the greater offense if it is impossible to commit the greater without also committing the lesser.").

The question is whether the State had to prove, on the charge of assault while participating in burglary, that defendant actually *committed* the burglary in order to be *participating* in it. The answer is controlled by section 702.13 of the Code:

A person is "*participating in a public offense,*" during part or the entire period commencing with the first act done directly toward the commission of the offense and for the purpose of committing that offense, and terminating when the person has been arrested or has withdrawn from the scene of the intended crime and has eluded pursuers, if any there be. A person is "participating in a public offense" during this period *whether the person is successful or unsuccessful in committing the offense.*

(Emphasis added.) We applied that section, in a sexual abuse context, in *State v. Johnson*, 291 N.W.2d 6, 8 (Iowa 1980). Under the section, a person may participate in an offense although he does not commit it.

The result is that assault while participating in burglary can be committed without committing the burglary, hence the burglary is not necessarily included in the assault. Consequently burglary is not merged into assault while participating in burglary.

■ Defendant's second contention is that convictions for assault while participating in burglary and for burglary unconstitutionally subject him to double punishment for the same offense. The principal decision on this question, regarding state convictions, is *Brown v. Ohio*, 432 U.S. 161, 97 S.Ct. 2221, 53 L.Ed.2d 187 (1977), which relied on *Blockburger v. United States*, 284 U.S. 299, 52 S.Ct. 180, 76 L.Ed. 306 (1932) (federal convictions). *See also Harris v. Oklahoma*, 433 U.S. 682, 97 S.Ct. 2912, 53 L.Ed.2d 1054 (1977). A recent decision involving federal convictions is *Albernaz v. United States*, 450 U.S. 333, 101 S.Ct. 1137, 67 L.Ed.2d 275 (1981).

The gist of these decisions is that the double jeopardy clause prohibits prosecution for the lesser crime where the greater crime cannot be committed without committing the lesser one. *Harris*, 443 U.S. at 682, 97 S.Ct. at 2913, 52 L.Ed.2d at 1056 ("When as here, conviction of the greater crime, murder, cannot be had without conviction of the lesser crime, robbery with firearms, the Double Jeopardy Clause bars prosecution for the lesser crime after conviction of the greater one."). Since we have held that conviction on the present assault charge is not dependent upon conviction on the burglary charge, no violation of the double jeopardy clause appears.

■ III. *Sufficiency of evidence.* Defendant contends finally that the evidence is insufficient to generate a jury question on whether he had a dangerous weapon in his possession, in connection with the burglary charge. *See* § 713.2, The Code. We have examined the record and hold that sufficient evidence on the issue was introduced under the test in *State v. Robinson*, 288 N.W.2d 337, 339 (Iowa 1980).

We uphold the convictions and sentences for burglary and assault while participating in a felony, but direct the district court to dismiss the kidnapping charge.

DECISION OF COURT OF APPEALS VACATED; JUDGMENT OF DISTRICT COURT AFFIRMED IN PART, REVERSED IN PART.