In the

# United States Court of Appeals

## For the Seventh Circuit

No. 16-2756

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

*v.*

NICOLE C. EASON,

*Defendant-Appellant.*

Appeal from the United States District Court for the
Central District of Illinois.
No. 15-CR-20015 — **James E. Shadid**, *Chief Judge.*

ARGUED FEBRUARY 23, 2017 — DECIDED APRIL 21, 2017

Before POSNER, EASTERBROOK, and MANION, *Circuit Judges.*

POSNER, *Circuit Judge.* Nicole Eason and her husband Calvin Eason were indicted on two counts of kidnapping (one for each child kidnapped), in violation of a federal statute that so far as relates to this case punishes "(a) Whoever unlawfully seizes, confines, inveigles, decoys, kidnaps, abducts, or carries away and holds for ransom or reward or

otherwise any person, except in the case of a minor by the parent thereof, when—(1) the person is willfully transported in interstate or foreign commerce." 18 U.S.C. § 1201. The Easons were indicted in a third count of violating another federal statute, 18 U.S.C. § 2423(a), by transporting one of the children across state lines intending that the child "engage in … sexual activity" forbidden by Illinois law.

Calvin Eason pleaded guilty to all three counts; Nicole went to trial and the jury convicted her of all counts as well. The judge sentenced each defendant to 20 years in prison on each of the kidnapping counts and 40 years on the transportation-for-sexual-activity count, the sentences to run concurrently, making the total sentence for each defendant 40 years. There is no challenge to the sentences, and only Nicole has appealed the conviction.

In the first three years of their marriage the defendants had two children—and both were removed from the defendants' custody, the first child because she had been readmitted at the age of 10 months to the hospital in which she'd been born, with multiple fractures in her legs that the Easons could not explain, and the second child because of the removal of the first child from their custody as a consequence of their abuse and neglect of her and also because a social worker found that the Easons had neglected the second child as well and had kept their home in an unfit condition for raising children. As a further consequence of the mistreatment of the children the defendants' parental rights were permanently terminated.

After that the defendants, often using the Internet to make their pitch, falsely represented to adoptive parents (often from out of state) who could no longer take proper care

of their adopted children that they (that is, the defendants) were qualified to provide foster care to children—and even that they had documents prepared by social workers *recommending* them for the care of foster children. The Easons eventually obtained custody of some of these children, including the two children at issue in this case.

The Easons found the adoptive parents of the first child, K.R., in an Internet chat room for adoptive parents struggling to take care of the children they'd adopted. K.R. was experiencing emotional problems; another child in the same family had a rare, serious kidney disease and was deteriorating; and the father needed open-heart surgery—in short, the parents were overwhelmed. Although Nicole Eason's history of mistreating her own children would almost certainly have precluded her being allowed to take custody of new children, she told the parents that she had recently adopted a child who had the same emotional difficulties as K.R. (she hadn't), that she had paperwork authorizing her to provide foster care to children (she didn't), and that she could help out the family by taking custody of K.R. (she couldn't or wouldn't). The parents, perhaps out of desperation, agreed. They drove K.R. from their house in California to the Easons' residence, in Illinois. She was seven years old.

Mrs. Eason used similar tactics to obtain custody of the second child, A.B., who was thirteen and suffered from behavioral disorders. Eason met A.B.'s parents in an online chat group for struggling adoptive parents and expressed an interest in taking custody of A.B. The parents told Eason that she'd need to show them a home study (a document, routinely used in adoptions, prepared by a social worker and assessing a family's suitability to care for foster children and

including a background check). Eason agreed and flew to Texas, where A.B.'s parents lived, and gave them a home study forged by her though purportedly written by a social worker named Sharon Smalls. (That was an odd—and fraudulent—detail, for Sharon Smalls was the name of the social worker who had advised that the Easons' second biological child be removed from their custody.) The forged study stated falsely that Smalls "did not hesitate to recommend Calvin and Nicole Eason as good and prospective adoptive parents." And so Eason was able to return to Illinois with A.B. in tow.

Given the reasons for the removal of the Easons' own children from their custody, it is difficult to imagine a social worker's recommending that they be allowed to care for new children, and there is no evidence of any such recommendation. The Easons obtained the children by inveiglement (i.e., luring, enticement) of the children's adoptive parents. Once they had the children in their custody they abused them, or groomed them for abuse—including sexual abuse.

K.R., who turned eight while in the Easons' custody, testified that they'd had her lie in bed with them and watch pornographic movies, had fondled her, and had hit her when she resisted. A.B. was with the Easons for only a few days, but she likewise testified that the Easons had her lie in bed with them and watch pornographic movies, that Nicole Eason would sometimes lie naked in the bed, that the Easons monitored A.B.'s communications with her adoptive parents, and that she had begun to assume that the Easons' behavior was normal, because the Easons were her caretakers.

Eventually the adoptive parents, having grown suspicious, asked the defendants to return their children, and the defendants complied.

Mrs. Eason's principal argument (her husband, having pleaded guilty, has not appealed) is that the *children* who were the victims of the alleged kidnapping were not inveigled—it was the victims' adoptive *parents* who were inveigled—and that kidnapping by inveiglement requires that the person or persons inveigled be the ones who were kidnapped—i.e., held "for ransom or reward or otherwise"— and of course the adoptive parents whom the defendants inveigled were not removed from their homes or otherwise held against their will. Eason thus argues that the person inveigled must be the person held, and vice versa.

It's true that the first subsection of the federal kidnapping statute, quoted at the beginning of our opinion, states that "whoever unlawfully … inveigles … and holds for ransom or reward or otherwise any person … [and] the person is willfully transported in interstate or foreign commerce," is guilty of kidnapping. And here the inveigled—the adoptive parents—were not held or "willfully transported in interstate or foreign commerce." But the notion that inveiglement falls out of a kidnapping case if the kidnap victim is not inveigled is too confining. Suppose the defendants had gone to the adoptive parents' homes pretending to be medical personnel, and once there had convinced the parents that because of a polio epidemic the defendants had to take the children to a local hospital to be vaccinated. They would thus have been inveigling the parents as the means of absconding with the children. If that isn't kidnapping, then if a kidnapped baby were only three months old when kid-

napped and thus incapable of having been inveigled there would be no violation of the federal kidnapping statute even though the kidnappers had inveigled the parents of the baby to give it up to them. What sense would that make? None that we can see. As explained in *Chatwin v. United States*, 326 U.S. 455, 460 (1946), "if the victim is of such an age or mental state as to be incapable of having a recognizable will, the confinement then must be against the will of the parents or legal guardian of the victim." There is also, however, evidence that the defendants in this case inveigled the children too, by trying to make them feel that they would benefit from living with them.

Mrs. Eason argues that she didn't "hold" the children—an element of kidnapping in 18 U.S.C. § 1201(a)—because the parents voluntarily gave the children to her, and she returned the children at the parents' request, and therefore the children were not held against the will of the parents. But the children were "held"—they lived in her house, in her custody, under her control, unable to leave until Eason returned them to their adoptive parents at the parents' request—and Eason's holding of the children flouted the will of their parents because she had obtained the parents' consent to this arrangement only through inveiglement—by falsely claiming that she had been recommended to care for foster children.

After taking custody of them, moreover, she kept the adoptive parents at bay with further lies. She told K.R.'s parents she'd mail them a copy of her paperwork, but never did; she made excuses and then became difficult to contact. She had told A.B.'s parents she'd send them an updated home study—the forged home study that she had originally

shown them had (strangely) been out of date. When they pressed, she said there had been delays. Only when the parents realized she was lying did they demand the return of the children.

It remains only to consider Eason's objections to the jury instructions. The jury was instructed that "in order for you to find the Defendant guilty of [kidnapping], the Government must prove … First, the Defendant knowingly and acting contrary to law, kidnapped, seized, confined, inveigled, or decoyed any person; Second, the Defendant held the person for ransom, reward, or otherwise." Eason argues that these instructions allowed the jury to convict her on what she contends was the government's unsound theory of the case—that she had kidnapped the children by inveigling their parents. But as we've explained, the government's theory is sound—children can be kidnapped by means of the inveiglement of their parents; they were here. Notice too that the instruction we quoted required the jury, so far as bears on the present case, to find that the defendant knowingly "confined, inveigled, or decoyed any person," without requiring that the inveigled person also have been the confined (= kidnapped) person, consistent with Eason's having inveigled the adoptive parents but confined the children.

Second she argues that the instructions should have listed only "inveiglement" as a means of kidnapping—not the other methods or forms of kidnapping listed in the federal kidnapping statute—"kidnapped, seized, confined, … or decoyed," because inveiglement was the only form of kidnapping that the government asserted at trial. But there is nothing to suggest that limiting the instruction to inveiglement would have altered the jury's verdict. The word "or"

before the last term in the list would have made clear to the jury that it didn't have to find any kidnapping *method* other than inveiglement in order to convict the defendant. Indeed during its deliberations the jury sent a note to the judge asking whether it had to find *all* the means of kidnapping in order to convict Eason, or only one—and the judge replied that it had to find only one.

We find no error in the district court proceedings. The judgment of the district court is therefore

AFFIRMED.