**UNITED STATES of America, Appellee,**

v.

**Terrance Kenneth PROVOST,
Appellant.**

**No. 87–5351.**

United States Court of Appeals,
Eighth Circuit.

Submitted Oct. 21, 1989.

Decided May 15, 1989.

Rehearing and Rehearing En Banc Denied
June 22, 1989.

Robert C. Riter, Jr., Pierre, S.D., for appellant.

Mikal Hanson, Asst. U.S. Atty., Pierre, S.D., for appellee.

Before ARNOLD and MAGILL, Circuit Judges, and ROSS, Senior Circuit Judge.

MAGILL, Circuit Judge.

Terrance K. Provost (Provost) appeals from his conviction for aggravated sexual assault. 18 U.S.C. §§ 1153, 2241(c), 2245(2)(A). Provost alleges seven grounds for error: (1) denial of a motion to appoint an independent psychologist to examine the

victim; (2) permitting an expert witness to express an opinion on the credibility of the victim; (3) admission of hearsay testimony; (4) failure to exclude evidence going to the credibility of an alibi witness; (5) the denial of defendant's offer of proof regarding the victim's prior inconsistent statements; (6) denial of a motion for acquittal premised on the insufficiency of the evidence; and (7) lack of jurisdiction. We reject each of Provost's contentions and affirm his conviction.

## I.

Provost was charged with aggravated sexual assault of his ten-year-old half-sister, Loretta Stone. In 1986, Loretta lived with her father, Larry Stone, in Spearfish, South Dakota. On December 19, 1986, she went to Lower Brule, South Dakota, to spend the Christmas holidays with her mother, Shirley Marvin.[1] Loretta returned to Spearfish January 4, 1987. About two weeks later, Loretta told her step-mother, Nano Stone, that her step-brother, Terry Provost, had assaulted her at her mother's house.

Dr. Wayne Anderson, M.D., examined Loretta on January 26, 1987. During the examination, Loretta described the assault and identified Provost as the assailant. Dr. Anderson gave Loretta a physical examination, and noted a reddening around her vaginal opening. Because Loretta was hysterical, however, he could not perform a complete examination. A culture taken that day indicated positive for a venereal disease, chlamydia trachomatis. Dr. Anderson completed a second examination on April 28. At that time, he observed a slight tag or tear on the right side of her hymenal ring, and observed that the vaginal opening was about one centimeter. He

testified at trial that in his opinion, the opening was larger than average in prepubertal girls and, although not unusually large, suggested penetration.

In early March, Shirley Marvin told Provost of the allegations made against him, and his sister, Maria Thompson, told him that Loretta was infected with chlamydia. Provost went to the hospital in Eagle Butte, where he received treatment for an ear infection and was tested for sexually transmitted disease. Provost tested negative for chlamydia.

Before trial, Provost moved for appointment of an independent psychiatrist or psychologist to examine Loretta. The government joined in the motion and requested that Dr. Mary Curran, a clinical psychologist, be appointed to conduct the examination. The trial court granted the government's request. Later, the trial court granted a motion brought by defendant requesting appointment of a nontestifying expert to assist defendant's counsel in evaluating Dr. Curran's report and testimony at trial.

Dr. Curran interviewed Loretta on May 5, 1987. Loretta described the assault to Dr. Curran and identified Terry Provost as the assailant. At trial, Dr. Curran testified as to the emotional and psychological characteristics often observed in sexually abused children, and her observation that Loretta exhibited many of these characteristics.

At trial, Loretta testified that on the day after Christmas, she awoke in a second-floor room of her mother's house when she heard someone walking up the stairs. Provost entered the room, wearing only his underwear. He pulled up her nightgown, put his penis between her legs, and pushed

---

1. The following course of events occurred during the next two weeks. On Christmas Day, Marvin and Loretta went to Eagle Butte, South Dakota, to spend the day with Shirley Marvin's four adult children, Deanna, Maria, Linn and Terry (the defendant). On the 26th, Shirley Marvin and Loretta returned to Lower Brule, along with Deanna's sons, Paul and Michael Provost. When Michael contracted pneumonia and was hospitalized in Chamberlain, near Lower Brule, Shirley Marvin summoned Michael's mother, Deanna Provost, who drove to Lower Brule on December 29, along with her brother Terry Provost and her nieces, Shylo and Natasha. Another daughter of Marvin's, Maria Thompson, along with her husband and three children, arrived on December 31, and stayed until January 2. On January 3, Marvin and Loretta left Lower Brule, and the next day Marvin returned Loretta to her father, Larry Stone, in Spearfish.

until it entered her "private parts." After about five minutes, he put on his underwear without either of them saying anything. Loretta would not describe the defendant's body part which touched her, but she drew a picture of male genitals which was exhibited to the jury. After the assault, Loretta took a shower and washed "white stuff" and a little blood off her leg and private parts. Then, wrapped in a towel and wearing only shoes and underwear, she went to a next door neighbor's house, and asked to use the phone to call her mother at work. When her mother asked her what was wrong, she replied "nothing."

The neighbor, Donna Nibbelink, testified that she was like a grandmother to Loretta. She further testified that, although Loretta visited her house several times during the holiday, she never came over wearing just a towel, underwear and shoes, and that she never saw her in an excited or anxious mood during that holiday. Nibbelink kept a diary of her daily activities during this period, which was consistent with her testimony.

Defendant offered testimony from Nibbelink, Shirley Marvin and Deanna Provost to the effect that during the week after Christmas 1986, Terry Provost and Loretta were never alone together in the Marvin house.

After a four-and-one-half-day jury trial, Provost was convicted of aggravated sexual assault and sentenced to thirteen years imprisonment. This appeal followed.

## II.

### A.

■ Provost first asserts as error that the court-appointed expert, Dr. Curran, was not independent because she was selected by the government and because she had a "long-standing relationship" with the government in the prosecution of sexual abuse cases. The government contends that Dr. Curran was an independent witness and not the government's expert, and that Provost has failed to show that an additional independent psychological examination was necessary to his defense.

A trial court has broad discretion to grant application for appointment of an expert witness. *United States v. Schultz*, 431 F.2d 907, 910 (8th Cir.1970). Here, there is no question as to Dr. Curran's qualification as an expert. Rather, the issue is whether Dr. Curran is an *independent* witness or whether her independence is compromised by her role as a prosecution witness in other cases. We find that the trial court did not abuse its discretion in appointing Dr. Curran to conduct an independent examination of the victim or in denying the defendant's request for a second independent examination.

The fact that Dr. Curran has been called as a prosecution witness in a number of previous cases does not make her an employee of the government or necessarily compromise the independence of her examination of Loretta. Provost has made no showing that a second psychological examination would have been beneficial to the development of his defense. Provost had access to Dr. Curran's report and an opportunity to converse with her before trial. Almost six weeks before trial, the court appointed Dr. Lynn Goehring to assist defense counsel in analyzing Dr. Curran's report. Dr. Goehring was also present in the courtroom during Dr. Curran's testimony to provide assistance to the defendant.

### B.

■ Provost's second objection focuses on a portion of Dr. Curran's testimony which he characterizes as a comment on the credibility of the victim. In *United States v. Azure*, 801 F.2d 336 (8th Cir. 1986), this court held that an expert witness may not give his or her opinion as to the believability of a child witness. An expert's opinion on the credibility of the victim invades the exclusive province of the jury to determine the believability of a witness' testimony. *United States v. St. Pierre*, 812 F.2d 417, 419 (8th Cir.1987).

Dr. Curran testified that Loretta told her she took a shower after Provost assaulted her and that, while in the shower, a friend

of Provost's had entered the bathroom and confronted her. On redirect examination of Dr. Curran, the government's attorney inquired why Loretta would have stated that the sexual assault by Provost occurred on the same occasion as when a friend of Provost's confronted her in the shower. Dr. Curran testified, based on her understanding of the characteristics of sexually abused children, that a factual occurrence bearing some relation to an incident of abuse might serve as a "triggering mechanism" that would cause a victim to link two events as contingent in time even though they may have occurred on separate occasions. Dr. Curran stated:

> The triggering mechanism with the shower is that she had progressed in her telling me the incident that had happened and the fact that she was taking a shower may have triggered a memory of another incident and it did. It triggered the memory of the friend of Terry coming into the shower and looking at her and her response to it is screaming and he shouldn't have been there. So basically when she said the words when I said what happened next she said I took a shower and I washed that gunky stuff off and the blood, she connected the two things as contingent in time. They may or may not have been contingent in time. I think what is an elementary basic thing is that whether or not they were contingent in time *they both occurred* and the memory of taking the shower and washing the semen off of her body triggered the memory of the other intrusion into her private space and that she then was responding to the shower and the fact that something else happened in the shower. It may or may not have been— she presented them contingently as though it were one experience. Therapeutically it may not have been.

Tr. at 248–49 (emphasis added).

Dr. Curran did not directly offer an expert opinion on the credibility of Loretta. Her comment that "they [the two shower incidents] both occurred" is, at most, an implied statement of her belief that Loretta was telling the truth. In *Azure*, the expert, a pediatrician, testified that the victim was believable and that he could "see no reason why she would not be telling the truth in this matter." *United States v. Azure*, 801 F.2d at 339. Here, Dr. Curran's testimony was in line with circumstances the *Azure* court recognized as permissible: Dr. Curran testified generally about how a sexually abused child might temporally link discrete events, and expressed an opinion that Loretta's story linking the two events was consistent with her story of sexual abuse. Dr. Curran's comments stopped short of putting the "stamp of believability" on Loretta's entire story. *Id.* at 340. Although we do not sanction such an isolated statement, we hold it was obscure and harmless error. Even if Dr. Curran's comments were admitted in error, in the context of her answer to the question and her testimony as a whole, the trial court's refusal to strike the testimony and instruct the jury to disregard the same was not so prejudicial as to constitute reversible error.

## C.

■ As a third point of error, Provost challenges the admission of statements arguably excludable as hearsay testimony. First, Provost contends that it was hearsay to permit Nano Stone, Loretta's step-mother, to testify that "the actual story never varied" in response to a question whether Loretta's statements to her, to a social worker, and to the doctor that conducted her medical examination were consistent. We find that this statement was not hearsay as defined by Rule 801(a) of the Federal Rules of Evidence.

■ Provost also challenges the admission of statements made by Loretta to Drs. Anderson, Curran, and Hess. The testimony of Drs. Anderson and Curran included statements made by Loretta identifying Terry Provost as her assailant. Dr. Hess testified to statements made by Loretta over the course of nine sessions of psychological treatment in which Loretta expressed fear of having to "deal with Terry" and to his observation of nonverbal behaviors that indicated fear of Terry Provost.

The government contends that the statements were admissible under the hearsay exception for statements made for purposes of medical diagnosis or treatment. Fed.R.Evid. 803(4).[2] Provost disagrees, contending that the statements of identification go beyond the scope of the rule.

Although statements of fault or identity generally are not "reasonably pertinent to diagnosis or treatment," such statements may be essential to the treatment of a child who has been a victim of sexual abuse. *United States v. Renville*, 779 F.2d 430 (8th Cir.1985). The nature and extent of an abuse victim's psychological problems often depend on the identity of the abuser. *Id.* at 437.

The relevance of the victim's statements to diagnosis and treatment are particularly clear with respect to statements made to Dr. James Hess. Dr. Hess saw Loretta over a nine-week course of treatment, assisting in her psychological adjustment to the abuse and its relation to her difficulties in school. Likewise, the identity of the assailant as a family member was clearly relevant to Dr. Curran's diagnosis of the victim. While Loretta's statements to Dr. Anderson were less directly related to her actual treatment, statements by a victim of sexual assault to an examining physician might reasonably be relied on in treatment or diagnosis. *Id.* at 436. In *Renville*, the court held that the statement by a child abuse victim that the abuser was a member of the victim's immediate household was admissible when made for diagnosis and treatment of emotional or psychological injuries. *Id.* at 437. Here, although the defendant and the victim did not continuously reside in the same household, they were, at times before and during the time frame of the assault, residing together in their mother's household. As half-brother and half-sister, they are members of the same immediate family. The medical records hearsay exception applicable in

*Renville* is equally applicable to the present case.

### D.

Provost's fourth argument alleges that the trial court erred when it excluded a statement made by Loretta to an FBI agent investigating the assault. Her statement included an allegation that a week before Christmas, a cousin tried to take her pants off in a Pierre motel room. Provost contends that the allegation was false, and should have been admitted to impeach Loretta's credibility. During cross-examination, Loretta denied that she and her mother stayed overnight in Pierre on the day in question. When defense counsel attempted to impeach Loretta with her statement to the FBI agent, the trial court upheld the government's objection, ruling that the evidence was barred by Rule 412 of the Federal Rules of Evidence and, under Rule 403, the prejudicial effect of the evidence substantially outweighed its probative value.

Rule 412 limits the introduction of evidence of a victim's past sexual behavior in criminal cases involving charges of rape or assault. Fed.R.Evid. 412. We note first of all that the Rule requires a defendant to make a written motion to offer such evidence no later than fifteen days before trial to permit the trial court to make an *in camera* ruling on admissibility. Fed.R. Evid. 412(c)(1). Because no such motion was made here, the evidence was properly barred. However, even if we excuse procedural compliance with the Rule, none of the exceptions to the general rule of exclusion are applicable here.

In *United States v. One Feather*, 702 F.2d 736 (8th Cir.1983), this court articulated the policy behind Rule 412 as the protection against unwarranted intrusion into the victim's private life. In *One Feather*, the defendant wanted to impeach the victim by showing she had lied about

---

**2.** The "medical records exception" provides that the following are not excluded by the hearsay rule:

> **Statements for purposes of medical diagnosis or treatment.** Statements made for purposes of medical diagnosis or treatment

and describing medical history, or past or present symptoms, pain, or sensations, or the inception or general character of the cause or external source thereof insofar as reasonably pertinent to diagnosis or treatment.
Fed.R.Evid. 803(4).

her marital status, but the trial court prohibited the questioning on the ground that the evidence would indirectly bring the victim's past sexual behavior to the jury's attention by establishing that she had an illegitimate son. In affirming, this court noted that the general credibility of the witness was a matter collateral to her credibility concerning the alleged rape. *Id.* at 739.

We find further support in *United States v. Cardinal,* 782 F.2d 34 (6th Cir.), *cert. denied,* 476 U.S. 1161, 106 S.Ct. 2282, 90 L.Ed.2d 724 (1986), which involved a conviction for the rape of a minor child by her uncle on an Indian reservation. The Sixth Circuit held that it was not reversible error to exclude evidence that the victim had reported and withdrawn other accusations of sexual assault by family members. The Sixth Circuit approved the trial court's analysis of the Rule, and its conclusion that evidence of a prior allegation of rape was inseparable from evidence of the victim's past sexual behavior which the Rule was designed to exclude. *Id.* at 36. In this case, the trial court cited both the *One Feather* and *Cardinal* decisions in support of its ruling. We find that the trial court did not abuse its discretion in prohibiting impeachment of the victim because the evidence was barred by Rule 412 and properly excludable under Rule 403 as being unfairly prejudicial.

### E.

■ As a fifth point of error, Provost contends that the evidence going to the issue of Marvin's veracity, admitted over his objection, was remote and unduly prejudicial to his defense. The trial court permitted cross-examination of Shirley Marvin and testimony from rebuttal witnesses on three collateral incidents. The government argues that Marvin's credibility was at issue because she was a key alibi witness, and that the defendant opened the door to exploration of these otherwise collateral matters because the incidents were initially brought out by Marvin's direct testimony.

Shirley Marvin testified that after January 1987, Larry and Nano Stone attempted to prevent contact between her and Loretta, and that Loretta did not want to return to her father's house after Christmas vacation. On cross-examination, Marvin testified that the Stones and people at Loretta's school tried to keep her from seeing or communicating with Loretta. Dr. Hess testified on rebuttal that Marvin failed to keep an appointment to see Loretta in March 1987. Carol Hess, Loretta's teacher, testified that Loretta was not forcibly kept from seeing her mother in March when Marvin visited the school, but that Loretta, by her own choice, refused to meet with her mother. The government argued, over Provost's objection, that the evidence of Marvin's conduct as an indication of her veracity was relevant because of the defendant's suggestion that the Stones induced Loretta to manufacture the alleged assault in an attempt to win a custody dispute over Loretta and that they attempted to keep Loretta away from her mother to perpetuate the false allegation.

Given the nature of the events defendant attempted to establish, and the centrality of Marvin's testimony to this theory of defense, we hold that the trial court did not abuse its discretion in admitting evidence relevant to Marvin's credibility.

■ On direct examination, Marvin testified that on the evening of January 3, 1987, she and Loretta stayed at a motel in Pierre. In response to questioning from defense counsel, she identified a male guest who visited her at the motel that evening. Under cross-examination, the following exchange took place:

Q Then you said you had a, I believe you said you had a male visitor, a gentleman visitor?

A Yes I did.

Q You were reluctant to tell who that was. Can you tell the jury why you were reluctant?

A I wasn't reluctant. I just didn't know I could name a person in Court.

Q You didn't want to name—

A No. I said I didn't know I could.

Q Oh, okay. Well, isn't it true you were reluctant because he's married?

A   No.   I was reluctant to name him.

Q   He's not married?

A   I said I wasn't reluctant to name him.

Tr. at 319–20. An objection by defendant's counsel was overruled. The questioning resumed as follows:

Q   Is your gentleman friend married?

A   Yes he is.

Q   Isn't it true that you did rent a room at the Terrace Motel?

A   That's right. He rented the room for me.

Q   That's right. That's a room that he keeps there?

A   Yes.

Q   That you and he meet at because he comes from Watertown and you come up from Lower Brule and that's where you meet. It's a permanent motel room that he keeps here in Pierre, isn't that correct?

Tr. at 320–21. At this point, the court sustained an objection by defense counsel.

Provost contends that this testimony, like the other incidents already discussed, presents an attempt by the government to divert the jury's attention from the real issues and to prejudice Provost by evidence of his mother's conduct unrelated to his guilt or innocence. However, the identity of the male who visited Marvin in her motel room was established through direct examination by defense counsel. While the man's marital status is of questionable relevance, the trial court did sustain an objection to further exploration of his relationship with Marvin. On cross-examination, Marvin volunteered that her friend rented the room for her. In the context of Marvin's direct testimony, any abuse of discretion in permitting questions to establish the marital status of Marvin's friend was at most harmless error.

### F.

Provost's sixth argument focuses on sufficiency of the evidence. In considering a motion for acquittal based on the insufficiency of the evidence, we view the evidence in the light most favorable to the jury's verdict and accept as established any and all reasonable inferences tending to support the jury's verdict. The evidence need not "exclude every reasonable hypothesis except that of guilt" to be sufficient to convince the jury beyond a reasonable doubt the defendant is guilty. *See United States v. Marin–Cifuentes*, 866 F.2d 988, 992 (8th Cir.1989).

Here, the jury apparently gave credence to the testimony of the victim and the medical and psychological professionals that examined her, and discredited the testimony of the defendant and at least some of his alibi witnesses. Having carefully reviewed the record and defendant's arguments as to the remaining evidence, we find the evidence sufficient to sustain the jury's verdict.

### G.

Finally, we find that Provost's seventh asserted ground for reversal, a contention that 18 U.S.C. § 1153 does not confer jurisdiction, is without merit.

### III.

Accordingly, the conviction entered upon the jury's verdict is affirmed.