UNITED STATES of America,
Plaintiff–Appellee,

v.

Joey TOLEDO a/k/a Joey Toreneda,
Defendant–Appellant.

No. 90–4183.

United States Court of Appeals,
Tenth Circuit.

Feb. 19, 1993.

Jill M. Wichlens, Asst. Federal Public Defender (Michael G. Katz, Federal Public Defender, with her on the briefs), Denver, CO, for defendant-appellant.

William Ryan, Asst. U.S. Atty. (David J. Jordan, U.S. Atty., and Richard D. Parry, First Asst. U.S. Atty., on the brief), Dist. of Utah, Salt Lake City, UT, for plaintiff-appellee.

Before McKAY, Chief Judge, LAY[1] and BALDOCK, Circuit Judges.

McKAY, Chief Judge.

The Appellant, Joey Manuel Toledo, was convicted of kidnapping under 18 U.S.C. § 1201 (1988).[2] On this appeal, Mr. Toledo contends that the trial court erred in three respects. First, Mr. Toledo argues that the trial court failed to properly instruct the jury regarding the elements and nature of kidnapping under § 1201. Second, Mr. Toledo asserts that the court erred by allowing expert testimony which bolstered the victim's testimony. Finally, Mr. Toledo argues that the court erroneously failed to credit him with a two-level reduction for acceptance of responsibility under the federal sentencing guidelines. We affirm the trial court in all respects.

## I. Federal Kidnapping Statute

### A.

At trial, the consent of the victim, Stephanie, was a central issue. Stephanie testified that Mr. Toledo and another man approached her outside a grocery store.[3] Mr. Toledo threatened her, then offered her money in exchange for sex. When she refused, Mr. Toledo forced her into the car and told her that she was "going with him anyways [sic]." (R. vol. V at 5). He further warned her not to scream or he would kill her. Mr. Toledo then took Stephanie to his father's home where they stayed for several days, and where Mr. Toledo forced her to engage in various sex acts. At one point, Stephanie told Mr. Toledo she wanted to go home. According to Stephanie, Mr. Toledo said, "I'll take you home after I get done with you." Stephanie responded, "Don't hurt me," and Mr. Toledo said, "Just wait to see what I do to you." Mr. Toledo then went into the kitchen and returned with a butcher knife. (R. vol. V at 9–10). Stephanie testified that she wanted to go home but was afraid that Mr. Toledo would hurt her. (R. vol. V at 12, 55).

Other witnesses offered evidence that raised questions with regard to Stephanie's consent. Stephanie's sister, Diana, was present when Mr. Toledo confronted Stephanie at the grocery store. Diana testified that she observed from inside the store two men in a yellow car offer Stephanie something that looked like money. She testified that someone grabbed Stephanie, and then the two men left with Stephanie in the car.

Stephanie's mother testified that Diana told her Stephanie had "gotten into a car with a man.... And that they were driving away." (R. vol. V at 8). Stephanie's mother made no effort at that time to

---

1. Honorable Donald P. Lay, Senior Circuit Judge for the United States Court of Appeals for the Eighth Circuit, sitting by designation.

2. The Appellant was also convicted of violating 18 U.S.C. § 2423 (1988), which prohibits the interstate transportation of a minor for the purpose of engaging in sexual activity. He does not appeal this conviction.

3. At the time of this incident, Stephanie was fourteen years old. She is mentally retarded and suffers from severe and chronic mental illness, for which she was taking prescribed medication. (R. vol. IV at 4, 7).

report Stephanie missing or kidnapped. She testified that Stephanie occasionally stayed over night with friends without telling her. Stephanie's mother did not report Stephanie missing until after noon of the following day.[4]

Stephanie, her mother, and Mr. Toledo's sister, Esther, all testified regarding a phone call Stephanie made to her mother the day after Mr. Toledo brought her to his home. Stephanie testified that she called her mother to ask if she could go fishing with Mr. Toledo. Stephanie's mother told her that she could not go. When Stephanie's mother asked Stephanie where she was, Mr. Toledo told Stephanie to hang up. Stephanie told her mother, "Mom, I'm going fishing anyways [sic]." (R. vol. V at 43).

According to Stephanie's mother, Stephanie called and asked if she could go fishing with Mr. Toledo. Stephanie's mother testified that she told Stephanie she could not go and attempted to get the address of the Toledo home. Not knowing the address, Stephanie gave the phone to Mr. Toledo. Stephanie's mother testified that Mr. Toledo did not give her the address, whereupon she threatened to call the police. According to Stephanie's mother, Mr. Toledo said, "Okay do it," and hung up. (R. vol. VI at 4–5).

Esther gives a slightly different account of the phone call. According to Esther, Stephanie called her mother. Although Esther did not hear the entire conversation, she testified that Stephanie said into the phone, "F— you. I'm not going home," and passed the phone to Mr. Toledo. (R. vol. VI at 81).

Evidence regarding Stephanie's consent to travel to California was also somewhat conflicting. Stephanie testified that after several days of staying with Mr. Toledo's father and other members of the Toledo family, Mr. Toledo took her to a railroad yard where they boarded a freight train for California. On direct examination, Stepha-

nie stated that she did not want to go to Los Angeles with Mr. Toledo but that he threatened to throw her off the train if she did not. On cross-examination, the following exchange occurred:

COUNSEL: When you wound up at the railroad yard, did you talk about where you were going to go from there?

STEPHANIE: Uh, yeah. He said: First, we're going to stop off in L.A., and we'll take you to New York.

COUNSEL: You never got that far?

STEPHANIE: Uh-uh. I never did like New York

. . . .

COUNSEL: Los Angeles was okay, though?

STEPHANIE: Yeah.

COUNSEL: Was that okay with you[,] going to Los Angeles?

STEPHANIE: Yeah.

COUNSEL: That sounded all right?

STEPHANIE: Uh-huh.

(R. vol. V at 52–53).

On redirect examination, the government attempted to rehabilitate Stephanie's testimony. The following exchange occurred between Stephanie and the Assistant United States Attorney:

COUNSEL: You said something about it being okay with you to go to Los Angeles with Joey? I didn't understand that.

STEPHANIE: Yeah. It was okay with me to go to Los Angeles as long as he didn't hurt me, and I told him: If you promise not to hurt me, then I'll go with you. And he says, he promised, and he didn't hurt me on the way.

. . . .

COUNSEL: Okay. Now I'm confused Stephanie, and the ladies and gentlemen of the jury need to hear what really happened. Did you agree to go, or did he force you to go?

STEPHANIE: I agreed to go.

. . . .

---

**4.** Stephanie's mother testified that she went to the police station the following day and reported Stephanie as kidnapped. It appears, however, that the police may have listed her as a runaway. Stephanie's mother also assisted neighbors and the police in preparing posters encouraging Stephanie to "come home." (R. vol. VI at 10, 12–13).

STEPHANIE: I refused to go, and then I said: If you don't hurt me, then I'll go with you. And he said: I won't hurt you. So I said: It's okay. That was after I refused. But I said: I'm going to refuse, but if you try to hurt me, I'll refuse.

(R. vol. V at 57–58).

#### B.

The federal kidnap statute, codified at 18 U.S.C. § 1201 (1988), provides:

> (a) Whosoever unlawfully seizes, confines, inveigles, decoys, kidnaps, abducts, or carries away and holds for ransom or reward or otherwise any person, except in the case of a minor by the parent thereof, when—
>
>> (1) the person is wilfully transported in interstate or foreign commerce;
>>
>> . . . .
>
> shall be punished by imprisonment for any term of years or for life.

18 U.S.C. § 1201 (1988).

In its instructions to the jury, the trial court delineated the elements of the offense as follows:

> The United States must prove each of the following elements beyond a reasonable doubt in order to prove the crime of kidnapping:
>
> 1. That the defendant seized, confined, decoyed, inveigled, kidnapped, abducted, or carried away [the victim].
> 2. That the defendant held [the victim] for the reasons charged in the indictment;
> 3. That the defendant transported [the victim] in interstate commerce; and
> 4. That the defendant acted unlawfully, knowingly and willingly.

(R. vol. I, Jury Instruction No. 29).

The trial court further instructed the jury that

> [t]he defendant has raised the defense of consent. If you find that [the victim] went willingly and voluntarily with the defendant and stayed with him willingly and voluntarily, then you must find the defendant not guilty.

> However, it is not a defense to a charge of kidnapping if either of the following occurs: (1) a person initially goes willingly with another but later is confined or held against her will; or (2) a person is initially seized and held against her will but later agrees to accompany her abductor.

(R. vol. I, Jury Instruction No. 35).

Mr. Toledo contends that these instructions improperly instructed the jury regarding an essential element of the offense of kidnapping prohibited by § 1201. Mr. Toledo argues that in order to be convicted under § 1201, the jury must find that the victim was transported in interstate commerce against her will. The question presented is whether Mr. Toledo was entitled to an instruction that the jury find Stephanie not only was abducted against her will but that she was also transported in interstate commerce against her will.

■■■ "The sufficiency of the district court's instructions to the jury involve questions of law, which require de novo review." *United States v. Barrera–Gonzales*, 952 F.2d 1269, 1271 (10th Cir.1992). In examining jury instructions, we review the record as a whole to determine whether the instructions properly state the controlling law and sufficiently inform the jury of the issues relevant to the case. *Id.* A defendant is entitled to instructions on any theory of defense finding support in the evidence and the law. *United States v. Swallow*, 511 F.2d 514, 523 (10th Cir.), *cert. denied*, 423 U.S. 845, 96 S.Ct. 82, 46 L.Ed.2d 66 (1975). However, because defense counsel in this case failed to object to the instructions to the jury, our review is for plain error. *United States v. Zimmerman*, 943 F.2d 1204, 1213 (10th Cir.1991). We will not reverse the lower court for faulty instructions unless the error is "both obvious and substantial" and "undermine[s] the fundamental fairness of the trial and contribute[s] to a miscarriage of justice." *United States v. Mitcheltree*, 940 F.2d 1329, 1334 (10th Cir.1991).

#### C.

■■■ Section 1201 essentially federalizes the common-law crime of kidnapping in cer-

tain enumerated situations. Although the crime of kidnapping is complete upon the unlawful seizing and detention of the victim, federal jurisdiction over the crime attaches only upon meeting one of the jurisdictional predicates set forth in the statute. *See, e.g., United States v. Hughes,* 716 F.2d 234, 238 (4th Cir.1983). In this case, a federal crime has occurred only if predicated on the victim being "wilfully transported in interstate or foreign commerce." 18 U.S.C. § 1201(a)(1) (1988). The essential question we are presented is whether Congress intended this to be merely a jurisdictional requirement to avoid a constitutional issue, in which case the consent of the victim would not be relevant, or if Congress intended to criminalize only those abductions where the victim was transported in interstate commerce against his or her will. We conclude that Congress intended the latter.

It is well settled that the Commerce Clause empowers Congress to regulate or prohibit criminal activity. The Supreme Court has recognized at least three bases upon which Congress can found its attempts to address crime. In *Perez v. United States,* 402 U.S. 146, 91 S.Ct. 1357, 28 L.Ed.2d 686 (1971), the Court upheld provisions of the Consumer Credit Protection Act which prohibit extortionate credit practices. 18 U.S.C. §§ 891–96 (1988). In addressing the question of Congress' power under the Commerce Clause to reach criminal activity, the Court said:

> The Commerce Clause reaches, in the main, three categories of problems. First, the use of channels of interstate or foreign commerce which Congress deems are being misused, as, for example, the shipment of stolen goods (18 U.S.C. §§ 2312–2315) or of *persons who have been kidnapped* (18 U.S.C. § 1201). Second, protection of the instrumentalities of interstate commerce, as, for example, the destruction of an aircraft (18 U.S.C. § 32), or persons or things in commerce, as, for example, thefts from interstate

shipments (18 U.S.C. § 659). Third, those activities affecting commerce. It is with this last category we are here concerned.

*Perez,* 402 U.S. at 150, 91 S.Ct. at 1359 (emphasis added).

While the reference to kidnapping in *Perez* was merely dicta, it categorized § 1201 under the correct theory. The legislative history of § 1201 and subsequent judicial interpretation make clear that Congress viewed the transportation of kidnapped persons across state lines as a misuse of the channels of interstate commerce.[5]

The seminal case interpreting the federal kidnap statute is *Chatwin v. United States,* 326 U.S. 455, 66 S.Ct. 233, 90 L.Ed. 198 (1946). After reviewing the legislative history of § 1201, the Court concluded that

> This statute was drawn in 1932 against a background of organized violence. Kidnapping by that time had become an epidemic in the United States.... "Law enforcement authorities, lacking coordination, with no uniform system of intercommunication and restricted in authority to activities in their own jurisdiction, found themselves laughed at by criminals bound by no such inhibitions and restrictions. The procedure was simple—a man would be kidnapped in one State and whisked into another, and still another, his captors knowing full well that the police in the jurisdiction where the crime was committed had not authority as far as the State of confinement and concealment was concerned."

> It was to assist states in stamping out this growing and sinister menace of kidnapping that the Federal Kidnapping Act was designed. It proponents recognized that where victims were transported across state lines only the federal government had the power to disregard such barriers in pursuing the captors.

*Chatwin,* 326 U.S. at 462–63, 66 S.Ct. at 237 (citations omitted).

---

5. Congress was well aware of the "misuse of channels of interstate commerce" theory when it passed § 1201. *See e.g., Champion v. Ames,* 188 U.S. 321, 355–58, 23 S.Ct. 321, 326–28, 47 L.Ed. 492 (1903) (upholding law against interstate shipment of lottery tickets under the theory).

This discussion suggests that the concern of Congress in enacting the federal kidnap statute was not to regulate comprehensively an activity that it perceived as having an adverse effect on interstate commerce or to protect the instrumentalities of interstate commerce. Rather, Congress was attempting to address the misuse of interstate commerce by kidnappers to frustrate the efforts of state police.[6]

■ The question we therefore face is whether, given the misuse of interstate commerce theory that underlies § 1201, the consent of the victim to accompany the defendant in interstate travel constitutes a valid defense. We conclude that it does. As the Supreme Court made clear in *Chatwin*, "the involuntariness of the seizure *and detention* ... is the very essence of the crime of kidnapping." *Chatwin*, 326 U.S. at 464, 66 S.Ct. at 237 (emphasis added). If the victim is no longer being held against her will, the kidnapping has ended, and the interstate travel cannot serve to further the commission of the crime. *See United States v. Chancey*, 715 F.2d 543, 546 (11th Cir.1983). As the *Chatwin* court noted, Congress was concerned about "captors" "whisking" the victim across state line for "confinement and concealment." *Chatwin*, 326 U.S. at 462–63, 66 S.Ct. at 236–37. If an entirely intrastate kidnapping has terminated prior to any state laws being crossed, none of those terms apply, and the Congressional concern is inapplicable.

We are bolstered in this view by the views expressed by other circuits on this point. The Second, Fifth, Eighth and Eleventh Circuits all require the government to prove that the kidnapping had not terminated prior to the interstate transportation by the victim agreeing to accompany the defendant. *See United States v. McCabe*, 812 F.2d 1060, 1061 (8th Cir.), *cert. denied*, 484 U.S. 832, 108 S.Ct. 108, 98 L.Ed.2d 67 (1987); *Chancey*, 715 F.2d at 546; *United States v. Macklin*, 671 F.2d 60, 64 (2d Cir.1982); *United States v. McBryar*, 553 F.2d 433, 433 (5th Cir.), *cert. denied*, 434 U.S. 862, 98 S.Ct. 191, 54 L.Ed.2d 136 (1977). Additionally, this view is supported by the pattern jury instructions for the Fifth Circuit. *See* Federal Judicial Center, *Modern Federal Jury Instructions*, at 5–90 (government must prove "[t]hat the defendant intentionally transported [the victim] in interstate commerce while so kidnapped") (Fifth Circuit). Finally, we note that this court stated in dicta over three decades ago that a § 1201 violation requires the court to prove that the defendant "crossed the state line with the kidnapped victim in his custody." *Eidson v. United States*, 272 F.2d 684, 687 (10th Cir. 1959). Obviously, a consenting fellow traveller is no longer a "kidnapped victim in ... custody."[7]

■ The cases cited by the government, *United States v. Hughes*, 716 F.2d 234 (4th Cir.1983); *United States v. Bankston*, 603 F.2d 528 (5th Cir.1979); *United States v. Napier*, 518 F.2d 316 (9th Cir.), *cert. de-*

---

**6.** We are further persuaded by Congress' post-*Perez* amendments to § 1201. Congress amended § 1201 in 1972 to expand the jurisdictional base of the statute. Rather than attempting to construct an "affecting commerce" rationale for the statute in light of *Perez*, Congress expanded the jurisdiction of the statute based only upon particular specialized federal jurisdiction. *See* 18 U.S.C. § 1201(a)(2)–(5).

**7.** *United States v. Fritz*, 580 F.2d 370 (10th Cir.) (en banc), *cert. denied*, 439 U.S. 947, 99 S.Ct. 340, 58 L.Ed.2d 338 (1978), is not to the contrary. In that case we upheld the conviction of the defendant despite the trial court's rejection of his proffered instruction that "if you find that [the victim] either volunteered or consented to accompany the defendant, you must find the defendant not guilty." *Id.* at 378. This court

unanimously rejected the defendant's argument: "We hold that the evidence simply does not support the giving of Fritz's tendered instruction. However, the instruction given [instead] by the trial court relative to the need to find that an alleged kidnap victim did not voluntarily accompany the party accused effectively covered Fritz's requested instruction." *Id.*

Fritz's proposed instruction concerned the defense of consent in general, not as specifically applies to the interstate aspect of § 1201. Further, this court, in rejecting it, did not in any way suggest that the underlying principle was wrong, merely that the instruction was both unsupported by the evidence and adequately covered by the trial court's chosen language. We therefore conclude that *Fritz* is not inconsistent with this opinion.

*nied,* 423 U.S. 895, 96 S.Ct. 196, 46 L.Ed.2d 128 (1975); and *United States v. Duncan,* 855 F.2d 1528 (11th Cir.1988), *cert. denied,* 489 U.S. 1029, 109 S.Ct. 1161, 103 L.Ed.2d 220 (1989), are not to the contrary. *Hughes* is simply not on point, as it concerns whether the perpetrator must have formed the intent to kidnap the victim prior to crossing state lines. *Hughes,* 716 F.2d at 237.[8] The other cases reject the argument that the defendant must possess some *mens rea* regarding the crossing of state lines, concluding that the interstate aspect of § 1201 is merely jurisdictional and not an element of the crime. We have no quarrel with this formulation of the statute. The interstate aspect of the statute merely requires that a state line be crossed while the crime is in progress. It does not alter the basic elements of kidnapping.[9]

■ The record contains conflicting information regarding Stephanie's consent to accompany Mr. Toledo to California. Consequently, we believe that Mr. Toledo was entitled to an instruction that no federal crime was committed if Stephanie willingly consented to the interstate travel. Additionally, the statement of the law in Jury Instruction 35, which stated that Stephanie's consent before or after abduction was no defense, was potentially confusing. The instruction indicated that it would be no defense to a § 1201 violation that Stephanie consented to travel with Mr. Toledo to California because she was initially seized against her will. Consent would, however, constitute a defense if it were given before Stephanie were transported in interstate commerce. As such, the instruction should

have reflected the requirement that the kidnapping still be in progress at the time Stephanie crossed state lines.

We reject, however, Mr. Toledo's argument that the court's instructions constituted plain error, warranting a reversal. In reviewing the conviction for plain error, we affirm if after pondering all that occurred at trial, we conclude that the error did not undermine the fundamental fairness of the trial or contribute to a miscarriage of justice. *United States v. Mitcheltree,* 940 F.2d 1329, 1334 (10th Cir.1991).

In this case, there was ample evidence that Mr. Toledo forced Stephanie to accompany him to California. By the time that Mr. Toledo and Stephanie boarded the train, she had been without medication for several days. (R. vol. VI at 4). Stephanie testified that if she did not go with him he would throw her from the train. (R. vol. V at 12). She told Mr. Toledo that she would go to Los Angeles with him if he would not hurt her. (R. vol. V at 58). Stephanie further testified that after she arrived in Los Angeles she was forced to take drugs and to engage in sex. (R. vol. V at 13, 16). Finally, Stephanie testified that when she got to the women's shelter in Los Angeles, she told the people there that she did not want to leave the shelter because she was "scared of [Mr. Toledo] and [she] wanted to be put in a hospital where [she would be] safe." (R. vol. V at 16). Conversely, the only direct evidence of Stephanie's consent was her concededly equivocal testimony at trial. In light of this evidence, even taking into account Stephanie's rather equivocal statements regarding her consent to go to

---

**8.** In fact, *Hughes* can be read as supporting our conclusion. *Hughes* held that if the victim voluntarily accompanies the defendant across state lines before being kidnapped, no federal crime occurs. Today we hold that no federal crime occurs if the victim voluntarily accompanies the defendant across state lines after the kidnapping is over. Both propositions support the theory that the victim must be held against her will at the time the state line is crossed to invoke federal jurisdiction.

**9.** Neither are we persuaded by cases from other circuits that consider actions by the perpetrator which constitute inveigling or decoying as ele-

ments of § 1201. *See, e.g., United States v. McInnis,* 601 F.2d 1319 (5th Cir.1979) (conspiracy to lure victim to Mexico and then kidnap), *cert. denied,* 445 U.S. 962, 100 S.Ct. 1649, 64 L.Ed.2d 237 (1980); *United States v. Hoog,* 504 F.2d 45 (8th Cir.1974) (misrepresenting intention to drive victim to destination), *cert. denied,* 420 U.S. 961, 95 S.Ct. 1349, 43 L.Ed.2d 437 (1975); *Davidson v. United States,* 312 F.2d 163 (8th Cir.1963) (enticing victim with promise to pay for babysitting). The instant case does not present the question of whether inveigling or decoying the victim across state lines for subsequent abduction violates § 1201, and we reserve judgment on this issue.

California, we cannot conclude that the conviction undermined the fairness of the trial nor that it contributed to a miscarriage of justice. Consequently, we affirm the trial court on this issue.

## II. Admission of Expert Testimony

At trial, two expert witnesses testified for the government. Gary Perkins was a psychiatric technician at the Skid Row Mental Health Clinic in Los Angeles. According to Perkins, Stephanie arrived at the clinic in a very fragile psychiatric state. He testified that she seemed very frightened and exhibited bizarre behavior. Perkins stated that during the course of the interview at the clinic, he attempted to elicit information from Stephanie regarding how she had come to the clinic. Perkins testified that he was left with the impression that she had "gotten away from" a forty-one-year-old male person with whom she had had sex and that she was very frightened that this person would come for her.

When asked how he knew that this person was male, Perkins responded:

> Oh, it was very clear that it was a male. No matter how crazy people are or how psychotic people are, we, as therapists, try to look for that window of normalcy; and there were certain little windows of normalcy that things she told me, *I knew were very true*. One of those was that this was a male 41 years old....

(R. vol. V at 73) (emphasis added).

Dr. Thomas Wallace was a psychiatrist at the Los Angeles County U.S.C. Medical Center in 1989. He examined Stephanie when she was admitted at that facility. Dr. Wallace testified that when Stephanie was admitted, she was "in moderate to severe emotional distress," was disoriented, and exhibited bizarre behavior. *Id.* at 83–84. To determine how Dr. Wallace conducted the examination and reached this diagnosis, the Assistant United States Attorney asked:

> COUNSEL: Now, could you finally just describe—you've talked about delusions, and you've talked about memory, and you've talked about statements that she

made to you. As a psychiatrist, how do you ferret out what appears to be reality and what appears to be some kind of psychosis?

> WALLACE: Stephanie has a history, according to her treating psychiatrist in Salt Lake City, of psychotic symptoms.... In my opinion, *it appears that what occurred was:* One, she was off her medication; two, she underwent emotional trauma that contributed to her psychotic symptoms. I couldn't ferret out how much one or the other played a role.

(*Id.* at 96) (emphasis added).

On redirect, the Assistant United States Attorney again asked how Dr. Wallace was able to "sort out ... what's delusional from what is accurate history as reported by the patient." (R. vol. V at 106). Dr. Wallace responded:

> WALLACE: Well, delusions are fixed false beliefs which have no basis in reality and histories are—well, if it makes sense, then its not a delusion. Sometimes it's difficult to determine whether or not something is delusional material or not [sic] or is part of a paranoid system or stems from her thought disorder....

> ....

> COUNSEL: Now in the course of her treatment did you ferret out which you believed or which you, as a doctor, diagnosed as delusional and which you thought was an accurate history or is that—

> WALLACE: It's—we're in an acute facility, and we don't often get the opportunity to investigate fully a patient's history; but on the basis of what was presented to me, it appeared to me that her consistency in reporting the nature of her abduction, being taken against her free will at a train station and meeting at a Chinese market, were *consistent with a high likelihood that this occurred.*

(R. vol. V at 106–07) (emphasis added).

 Mr. Toledo contends that the trial court erred in admitting these statements, because they effectively bolstered Stephanie's testimony. The admission of expert

testimony is reviewed for abuse of discretion by the trial judge. *United States v. Samara*, 643 F.2d 701, 705 (10th Cir.), *cert. denied*, 454 U.S. 829, 102 S.Ct. 122, 70 L.Ed.2d 104 (1981). Because Mr. Toledo failed to make a timely objection to the testimony, we reverse the conviction on this ground only if the admission constituted plain error.

 The credibility of witnesses is generally not an appropriate subject for expert testimony. *Samara*, 643 F.2d at 705. Courts have excluded such testimony for various reasons. Many courts exclude expert testimony on the credibility of other witnesses because it usurps a critical function of the jury. *See, e.g., Samara*, 643 F.2d at 705; *United States v. Scop*, 846 F.2d 135, 142 (2d Cir.1988). Such testimony is often excluded because it is not helpful to the jury, which can make its own determination of credibility. *See, e.g., Scop*, 846 F.2d at 142; *United States v. Binder*, 769 F.2d 595, 602 (9th Cir.1985). Yet another rationale for exclusion is that the testimony of impressively qualified experts on the credibility of other witnesses is prejudicial and unduly influences the jury. *See, e.g., Scop*, 846 F.2d at 142.

In *United States v. Azure*, 801 F.2d 336 (8th Cir.1981), the Eighth Circuit reversed the conviction of a defendant convicted of child sexual abuse. The court held that the testimony of a pediatrician that the victim was believable and that he could "see no reason why she would not be telling the truth in this matter" was impermissible credibility testimony. *Id.* at 339–40. The court went on to say that the pediatrician could have permissibly testified

> about a child's ability to separate truth from fantasy, by summarizing the medical evidence and expressing his opinion as to whether it was consistent with [the victim's] story that she was sexually abused, or perhaps by discussing various patterns of consistency in the stories of child sexual abuse victims and comparing those patterns with the patterns in [this victim's] story. However, by going fur-

ther an putting his stamp of believability on [the victim's] entire story, [the expert] essentially told the jury that [the victim] was truthful in saying that Azure was the person who sexually abused her.

*Id.* at 340–41.

The Eighth Circuit relied on this dicta to hold in another child sex abuse case that an expert's testimony regarding the testimony of the victim was admissible. *United States v. Provost*, 875 F.2d 172, 176 (8th Cir.), *cert. denied*, 493 U.S. 859, 110 S.Ct. 170, 107 L.Ed.2d 127 (1989). In *Provost*, a child psychologist testified that it was not unusual for a child victim of sexual abuse to link two traumatic events together, even though they did not actually occur at the same time. When asked to explain why the victim in that case might have linked two events, the psychiatrist stated: "I think what is an elementary basic thing is that whether or not they were contingent in time *they both occurred.:.*" *Id.* at 176. The court held that this was the type of testimony anticipated by *Azure* as admissible.[10]

Because our review is for plain error, we reverse only if the admission of the testimony of Mr. Perkins and Dr. Wallace "undermine[d] the fundamental fairness of the trial and contribute[d] to a miscarriage of justice." *United States v. Mitcheltree*, 940 F.2d 1329, 1334 (10th Cir.1991). In light of *Azure* and *Provost*, the admissibility of the testimony in question here presents a close question. The closeness of the question prevents us from finding that an "obvious and substantial" error has occurred. *See Mitcheltree*, 940 F.2d at 1334. Consequently, we affirm the trial court in admitting this testimony.

### III. Acceptance of Responsibility

Mr. Toledo further argues in this appeal that the trial court erred in failing to credit him with a two-level reduction for acceptance of responsibility under the federal sentencing guidelines. Mr. Toledo argues that the court failed to resolve a dispute between the presentence report and Mr.

---

**10.** The court's holding is not entirely clear. The court appears to have held that the admission of the evidence was not error, but even if it were, it was harmless error.

Toledo's objections to the presentence report filed prior to sentencing. According to the presentence report, Mr. Toledo did not fully accept responsibility for the crime. Mr. Toledo objected on the grounds that given his limited intellect, his version of the facts constituted acceptance of responsibility. Mr. Toledo asserts that § 6A1.3 of the United States Sentencing Guidelines required such a resolution.

Although Mr. Toledo objected in writing to the presentence report, he did not object at the sentencing hearing to the judge's alleged failure to resolve the dispute as required by § 6A1.3. Consequently, he waived his right to such a resolution. *United States v. Rios–Ramirez*, 929 F.2d 563, 566 n. 2 (10th Cir.1991). Additionally, we are of the view that the trial court resolved the factor in dispute by effectively adopting the presentence report. The court stated, "I have reviewed the trial notes, the file, the addendum and the full Presentence Report in this case. I rely upon the factual materials set forth in the Presentence Report." (R. vol. VII at 25). The presentence report contained Mr. Toledo's objection to the probation office's failure to give the reduction for acceptance of responsibility as well as the probation office's response to those objections. The court's statement at the sentencing hearing was sufficient to resolve the disputed factors. *See United States v. Sherbak*, 950 F.2d 1095, 1099–1100 (5th Cir.1992). Consequently, we affirm the trial court on the sentencing.

IV. Conclusion

After reviewing the issues Mr. Toledo presents in this appeal, we find no error warranting reversal. Consequently, we AFFIRM the trial court in all respects.